**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

NATALIE KRALL, *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

WEBEYECARE, INC.,

Defendant.

Case No.: 2:26-cv-08273

**DEMAND FOR JURY TRIAL**

**CLASS ACTION COMPLAINT**

Plaintiff Natalie Krall, individually and on behalf of all others similarly situated ("Plaintiff"), brings this class action lawsuit against WebEyeCare, Inc. ("WebEyeCare" or "Defendant") and alleges, upon personal knowledge as to her own actions and her counsel's investigation and upon information and good faith belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1. A person's eye health, like every other aspect of her health, is deeply private and legally protected. The rise of online contact-lens and eyewear retailers has created an unprecedented opportunity to track and profile unsuspecting consumers, as some retailers now share the very information their customers are legally required to disclose to them with undisclosed advertising partners like Meta, Google, Microsoft, and TikTok. The result is that millions of Americans who wear glasses or contact lenses are, without their knowledge or consent, having their private health information treated as advertising inventory.

2. This class action lawsuit addresses Defendant's unauthorized disclosure of users' personally identifiable information ("PII") and health-related information—including the

prescription contact lenses they view, select, and purchase—to third-party advertising platforms and marketing-technology companies without those users' knowledge or consent.

3. Contact lenses are medical devices regulated by the U.S. Food and Drug Administration that, by federal law, may be sold only pursuant to a valid prescription written by a licensed eye-care prescriber.[1]

4. Some 45 million Americans wear them to correct myopia, hyperopia, astigmatism, and presbyopia.[2] The brand, modality, and parameters of the lens a person wears—and the fact that the person wears corrective lenses at all—describe that person's eyes, her diagnosed vision condition, and the medical treatment she has been prescribed for it.

5. Defendant is an online retailer of prescription contact lenses, eyeglasses, and related products. Defendant owns, maintains, and controls the web domain webeyecare.com and its subdomains (collectively, the "Website"), through which consumers across the United States, including in Pennsylvania, browse contact-lens products by brand and type, select the prescription parameters for each eye, submit their prescriber and vision-insurance information, and purchase lenses that Defendant ships to their homes after verifying their prescriptions as the federal Contact Lens Rule requires.[3]

---

[1] U.S. Food & Drug Admin., *Contact Lenses*, https://www.fda.gov/medical-devices/consumer-products/contact-lenses (last visited Oct. 27, 2026); *see also* 21 C.F.R. § 801.109 (prescription devices).

[2] Ctrs. for Disease Control & Prevention, *About Contact Lenses*, https://www.cdc.gov/contact-lenses/about/index.html (last visited Oct. 27, 2026) (referring to "the 45 million people in the U.S. who wear them").

[3] *See* 15 U.S.C. §§ 7601–7610; 16 C.F.R. Part 315; Fed. Trade Comm'n, *The Contact Lens Rule: A Guide for Prescribers and Sellers*, https://www.ftc.gov/business-guidance/resources/contact-lens-rule-guide-prescribers-sellers (last visited Oct. 27, 2026).

6. Defendant uses the Website to capture and transmit the PII and health-related information of Website visitors and customers to third-party marketers.

7. Through trackers embedded on the Website—including on the product pages where users reveal the specific prescription lens they wear and on the cart and checkout pages where they enter their names, addresses, email addresses, telephone numbers, prescription details, and insurance and payment information—Defendant causes Meta Platforms, Inc., Google LLC, Microsoft Corporation, TikTok Inc., Attentive Mobile Inc., and Hotjar Ltd. (a subsidiary of Contentsquare S.A.S.) to collect user data including PII and health-related information in real time.

8. As a seller of prescription medical devices that verifies and fills prescriptions, solicits vision-insurance information, and offers its customers an online vision test to obtain or renew a prescription, Defendant has an obligation not to disclose this data without the consent of those who provided it, and to protect the privacy and confidentiality of the PII and health-related information in its possession, custody, or control.

9. This obligation is imposed by federal and state law, including the Electronic Communications Privacy Act, the Pennsylvania Wiretapping and Electronic Surveillance Control Act, the Federal Trade Commission Act, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and by Pennsylvania's common law of privacy. *See, e.g., Rand v. Eyemart Express, L.L.C.*, 2026 WL 3180055 at *6 (5th Cir. Oct. 23, 2026) (reversing dismissal and holding that "Plaintiffs' tracked information from the Site relates to their health and the provision of healthcare services, [thus] the Search Plaintiffs have adequately alleged that they shared private health information with Eyemart.").

10. Despite these obligations, Defendant has systematically violated its users' privacy rights by using tracking technologies on its Website that capture and transmit PII and health-related

information to third parties for marketing and analytics purposes, including measuring and attributing Defendant's advertising, profiling users, and targeting them with advertisements based on the prescription products they view and buy.

11. These disclosures occur without Website users' knowledge, consent, or authorization. At no point in the customer journey—from the home page, through the product pages, the cart, and the multi-step checkout, to the order confirmation—is the user shown, asked to accept, or directed to any terms of use or privacy policy.

12. When users shop for contact lenses through the Website, they reasonably expect that the information they reveal—the corrective lens they have been prescribed, the parameters of their prescription, their prescriber, their vision-insurance coverage, and the identifying information needed to ship a prescription product to their home—will remain confidential between them and Defendant. Instead, Defendant shared this information with technology companies and marketing platforms that use it for their own commercial purposes.

13. Plaintiff brings this action on behalf of herself and the putative Classes defined below to secure redress for: (i) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* ("ECPA"); (ii) violations of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5701, *et seq.* ("WESCA"); (iii) violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* ("UTPCPL"); (iv) intrusion upon seclusion; and (v) unjust enrichment. Plaintiff seeks damages and injunctive relief, including Court-ordered implementation of industry-standard data-privacy controls, regular compliance audits of data-sharing practices, and comprehensive monitoring services to prevent future unauthorized data transmission to third parties.

## PARTIES

14. Plaintiff Natalie Krall is an adult citizen of the Commonwealth of Pennsylvania who lives, and at all relevant times has lived, in Munhall, Pennsylvania, within Allegheny County, and who used the Website and purchased prescription contact lenses from Defendant in or around January 2025.

15. Defendant WebEyeCare, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 10 Canal Street, Suite 205 in Bristol, Pennsylvania 19007, in Bucks County.

## JURISDICTION & VENUE

16. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action lawsuit wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. This Court also has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts a claim under the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*, and supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

17. This Court has general personal jurisdiction over WebEyeCare because it is incorporated in and maintains its principal place of business in Pennsylvania and is therefore at home in the Commonwealth. This Court also has specific personal jurisdiction over Defendant because Defendant purposefully directs its business activities toward Pennsylvania and this District, and because Plaintiff's claims arise from those contacts.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because WebEyeCare resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events

giving rise to Plaintiff's claims occurred in this District: WebEyeCare designed, deployed, and operates the Website and the tracking technologies at issue from its headquarters in Bucks County, which lies within the Eastern District of Pennsylvania, 28 U.S.C. § 118(a).

## FACTUAL ALLEGATIONS

### I. DATA TRACKING IN THE ONLINE CONTACT LENS INDUSTRY

19. Approximately 45 million Americans wear contact lenses.[4]

20. Under federal law, contact lenses are prescription medical devices, and a seller may dispense them only after obtaining a copy of the wearer's prescription or verifying it directly with the prescriber.[5]

21. The Fairness to Contact Lens Consumers Act and the Federal Trade Commission's Contact Lens Rule govern that verification process in detail, including the information a seller must collect from the consumer—the consumer's name, the prescriber's name and contact information, and the prescription's parameters—before an order may ship.[6]

22. Contact-lens purchasing has increasingly moved online. The Vision Council reports that 37 percent of contact-lens purchases in 2022–2023 were made online, and that by the third quarter of 2024, 40 percent of surveyed adults who bought contact lenses did so online.[7] Industry

---

[4] *See About Contact Lenses, supra* n. 2.

[5] *See Contact Lenses, supra* n. 1.

[6] *See The Contact Lens Rule: A Guide for Prescribers and Sellers, supra* n. 3.

[7] *The Vision Council Reports U.S. Consumers' Prescription Purchase Choices*, Glance by Eyes On Eyecare (Mar. 16, 2024), https://glance.eyesoneyecare.com/stories/2024-03-16/the-vision-council-reports-us-consumers-prescription-purchase-choices/ (last visited Oct. 27, 2026) (37% of contact lens purchases made online); *TVC Report Reveals Trend Away from Online Eyewear Purchases, Plus More*, Eyecare Business (Nov. 7, 2024), https://eyecarebusiness.com/news/2024/tvc-report-reveals-trend-away-from-online-eyewear-purchases-plus-more/ (last visited Oct. 27, 2026) (40% of surveyed adults bought contact lenses online in Q3 2024).

analysts value the United States contact-lens market at more than $3 billion annually and identify the growth of online sales as a principal driver of its continued expansion.[8]

23. Perhaps not surprisingly then, the market for online contact-lens retailers—who compete on price for a commodity product that consumers reorder on a recurring schedule—is extremely competitive.

24. The competitiveness of the industry has led some online contact-lens retailers to rely heavily on digital advertising for customer acquisition and reactivation, including paid advertising on Meta's Facebook and Instagram platforms, Google search and display advertising, Microsoft's Bing search advertising, and TikTok, and to deploy website tracking technologies to measure advertising effectiveness, build audiences, and retarget prospective and lapsed customers.

25. Unfortunately, the lucrative market around health data has led some companies to devalue customer privacy, exposing information that consumers reasonably expect a seller of prescription products to keep confidential.

26. A June 2023 investigation by journalists at *The Markup* and KFF Health News tested the websites of twelve of the largest drugstore chains in the United States and found that tracking tools on those sites sent shoppers' browsing and purchase data to Meta, Google, and Microsoft, including when shoppers viewed HIV tests, added pregnancy tests and emergency contraception to their carts, and searched for prescription medications by name. Meta's own spokesperson responded that "[a]dvertisers should not send sensitive information about people through our Business Tools."[9]

---

[8] *United States Contact Lens Market Report 2025*, Business Wire (Mar. 14, 2025), https://www.businesswire.com/news/home/20250314575846/en (last visited Oct. 27, 2026).

[9] Darius Tahir and Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, KFF Health News / The Markup (June 30, 2023),

27. A December 2022 investigation by journalists at *The Markup* and STAT News examined 50 direct-to-consumer telehealth companies and found that 49 had third-party tracking code with the potential to collect and share sensitive health data with Meta and other advertising platforms.

28. On 25 of those sites, tracking codes informed tech platforms when users added prescription products to shopping carts or completed checkout.[10]

29. Recognizing the sensitivity of health-related data shared on commercial websites and the potential for misuse of this information, federal regulators have aggressively pursued companies for improper data sharing through tracking technologies.

30. In February 2023, for example, the Federal Trade Commission ("FTC") brought its first enforcement action under the Health Breach Notification Rule against GoodRx, which had shared the prescription medications its users searched for and purchased with Facebook, Google, and Criteo through tracking pixels, despite promising not to; the FTC obtained a $1.5 million civil penalty and a permanent ban on sharing health data for advertising.[11]

31. In March 2023, the FTC brought a similar action against BetterHelp, Inc., an online counseling platform that had disclosed its users' email addresses, IP addresses, and intake-questionnaire responses to Facebook, Snapchat, Criteo, and Pinterest for advertising; the FTC

https://kffhealthnews.org/news/article/drugstores-pixel-sensitive-data-social-media-companies/ (last visited Oct. 18, 2026).

[10] Todd Feathers, *et al.*, *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, The Markup (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies (last visited Oct. 27, 2026).

[11] Fed. Trade Comm'n, *FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising (last visited Oct. 27, 2026).

obtained a $7.8 million payment and a ban on sharing health data for advertising.[12] In July 2023, the FTC and the Department of Health and Human Services jointly warned approximately 130 hospital systems and telehealth providers that the use of the Meta Pixel and Google Analytics on their websites could disclose consumers' health information to third parties in violation of federal law.[13]

32. Despite these enforcement actions, online sellers of prescription products continue to extract and share user data with third parties for advertising purposes without the requisite notice and consent, exploiting the recurring nature of their customers' purchases and the sensitivity of the prescription information they are required by law to collect in order to profit through undisclosed third-party advertising integrations.

33. Medical and health data is one of the most valuable commodities in the digital economy. Industry analysts project the healthcare analytics market to reach $198.8 billion by 2033.[14]

---

[12] Fed. Trade Comm'n, FTC to Ban BetterHelp from Revealing Consumers' Data, Including Sensitive Mental Health Information, to Facebook and Others for Advertising (Mar. 2, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-ban-betterhelp-revealing-consumers-data-including-sensitive-mental-health-information-facebook (last visited Oct. 25, 2026).

[13] Fed. Trade Comm'n, *FTC and HHS Warn Hospital Systems and Telehealth Providers About Privacy and Security Risks from Online Tracking Technologies* (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (last visited Oct. 27, 2026).

[14] *Healthcare Analytics Market To Reach $198.8 Billion By 2033*, Grand View Research, https://www.grandviewresearch.com/press-release/global-healthcare-analytics-market (last visited Oct. 27, 2026).

34. Individual health records command premium prices in both legitimate and illicit markets, valued as much as fifty times more than credit card information due to their comprehensive nature and permanence.[15]

35. Third-party advertising and marketing platforms embedded in health-related websites are therefore extremely interested in this valuable data, which they can use to create detailed psychographic profiles for targeted advertisements and predictive modeling, and which can be combined with the data those platforms already hold about the same individuals from across the web.

## II. USERS' SENSITIVE INFORMATION, INCLUDING HEALTH-RELATED DATA, IS SOLICITED BY AND DIVULGED TO DEFENDANT THROUGH THE WEBSITE.

36. Defendant owns and operates the Website as an online retailer of prescription contact lenses, eyeglasses, sunglasses, and related products.

37. Defendant acknowledges that it "is required to verify the contact lens prescription for each order before we can process and ship the order."[16]

38. To purchase contact lenses through the Website, a user must therefore navigate to the product page for the specific brand and type of lens she has been prescribed; select the quantity and supply; supply the prescription parameters for each eye and the name and contact information of her prescriber; and provide her name, shipping and billing addresses, email address, telephone number, and payment-card information.

39. Each contact-lens product on the Website is organized by brand, manufacturer, and modality—daily disposable, bi-weekly, monthly, toric, multifocal, and colored lenses—and each

---

[15] *Why Medical Data is 50 Times More Valuable Than a Credit Card*, ClearDATA, https://www.cleardata.com/news/medical-data-valuable-credit-card/ (last visited Oct. 27, 2026).

[16] WebEyeCare, *Terms*, https://webeyecare.com/terms/ (last visited Oct. 27, 2026).

product page bears a URL and title that identify the product by name, such as "Buy Acuvue Oasys 1 Day 90 Pack with Hydraluxe Daily Contacts" at webeyecare.com/acuvue-oasys-1-day-90-pack/, or "Biofinity 6 Pack."

40. A user's selection of a product page is therefore a statement about the user's eyes: that she has been prescribed that lens, in that modality, by a licensed prescriber, and—where the product is a toric or multifocal lens—that she has astigmatism or presbyopia.

41. Defendant does not provide notice of tracking on the Website's home page, product pages, cart, or checkout pages, and does not tell users, before it begins transmitting their data, that the prescription contact lens they view and purchase—and the identifying information they supply in order to purchase it—will be sent to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar.

42. The Website requires users to reveal the product they have been prescribed through product-page views and cart selections, and then to supply their prescription parameters, prescriber information, names, addresses, email addresses, telephone numbers, and payment information in order to complete a purchase, all before they are ever shown any privacy policy or terms of use.

43. The Website contains numerous first- and third-party tracking implementations that measure and record user data. These tracking technologies, including web beacons, pixels, tags, and software development kits, are small pieces of code that developers integrate directly into their websites to track user behavior and transmit data to third-party platforms—in this case, transmitting the prescription products users view and purchase, together with persistent identifiers for the users who view and purchase them, for advertising and analytics purposes.

44. Specifically, Defendant has deployed on the Website the Meta Pixel together with a Meta Conversions API Gateway operating on Defendant's own subdomain; the Google Ads tag and Google Analytics, deployed through Google Tag Manager; the Microsoft Advertising

Universal Event Tracking ("UET") tag; the TikTok Pixel; the Attentive tag; and Hotjar session replay software likewise operating through a subdomain of webeyecare.com (collectively, the "Tracking Technology").

45. By installing and using these tracking technologies, developers—including those who created the Website or have been responsible for its maintenance and updates—embed these companies' technologies, enabling comprehensive data collection regarding users' product views, cart activity, checkout forms, purchases, and personal identifiers.

***a. Background on the Meta Pixel and the Meta Conversions API Gateway***

46. Meta Platforms, Inc. ("Meta") operates Facebook and Instagram, two of the world's largest social-media platforms. Meta derives substantially all of its revenue—more than $160 billion in 2024—from selling advertising.[17]

47. Meta provides advertisers with the "Meta Pixel" (formerly the "Facebook Pixel"), a snippet of JavaScript code that advertisers embed in their websites. Meta describes the Pixel as code that loads a library of functions in the visitor's browser, automatically logs a "PageView" event each time a page loads, and allows the advertiser to track conversions, build custom audiences, and run catalog-based advertising.[18]

[17] Meta Platforms, Inc., *Meta Reports Fourth Quarter and Full Year 2024 Results* (Jan. 29, 2025), https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results/default.aspx (last visited Oct. 27, 2026) (reporting advertising revenue of $160.6 billion out of total revenue of $164.5 billion); Meta Platforms, Inc., Annual Report (Form 10-K) for the fiscal year ended Dec. 31, 2024, https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm (last visited Oct. 27, 2026) ("we generate substantially all of our revenue from selling advertising placements").

[18] Meta for Developers, *Meta Pixel — Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Oct. 27, 2026).

48. Beyond automatically registered page views, an embedded Meta Pixel transmits "standard events"—such as "ViewContent," which Meta defines as "[a] visit to a web page you care about (for example, a product page or landing page)," "AddToCart," "InitiateCheckout," "AddPaymentInfo," and "Purchase"—each of which may carry parameters describing the content viewed or the action taken, including "content_ids" ("Product IDs associated with the event, such as SKUs"), "contents" (an array identifying each product and quantity), "content_type," "value," and "currency."[19]

49. Meta also offers "advanced matching," which, when enabled by the website operator, causes the Pixel to collect personal identifiers—including email addresses, first and last names, telephone numbers, and addresses—from the website's forms or data layer, hash them, and transmit them to Meta so that Meta can match the visitor to a Facebook or Instagram account.[20]

50. Meta holds the email addresses and telephone numbers of its billions of account holders; when it receives a hashed identifier that matches one on file, it associates the event with that account.

51. Defendant's Website runs on the BigCommerce e-commerce platform, and Defendant deployed the Meta Pixel through BigCommerce's native Meta integration, as the "a=plbigcommerce1.2" parameter in every Pixel request reproduced below reflects.

52. BigCommerce's documentation explains that, once a merchant connects its Meta Pixel in the store's control panel, the storefront automatically fires PageView, ViewContent (on product pages), ViewCategory, Search, AddToCart, InitiateCheckout, AddPaymentInfo, and

[19]Meta for Developers, *Meta Pixel — Reference*, https://developers.facebook.com/docs/meta-pixel/reference (last visited Oct. 27, 2026).

[20]Meta for Developers, *Advanced Matching*, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching (last visited Oct. 27, 2026).

Purchase events to Meta, supports Meta's Conversions API, and sends advanced-matching parameters—first name, last name, and email address—for shoppers who are logged in.[21]

53. Meta additionally offers a "Conversions API Gateway": a server instance that the advertiser provisions in its own cloud account, under a hostname of the advertiser's choosing, which "receives events data from browsers and then sends events data to the Conversions API" on Meta's servers.[22]

54. When a Gateway is deployed, the Meta Pixel sends each event twice—once directly to Meta and once through the advertiser's Gateway, to Meta's servers. Because the Gateway operates on the advertiser's own domain, it evades browser privacy features and ad blockers that would otherwise block requests to facebook.com, and the Gateway can set its own long-lived cookies on the advertiser's domain. Defendant operates such a Gateway at capig.webeyecare.com.

55. Meta's Business Tools Terms require advertisers to represent that they have "all of the necessary rights and permissions and a lawful basis" for the disclosure and use of the data they send through the Pixel, require advertisers to provide clear and prominent notice to users of that collection and sharing, and prohibit advertisers from sending Meta data that "includes or is based on, directly or otherwise, health information" or "other categories of sensitive information."[23]

56. The Terms thus place the responsibility to provide notice and obtain consent on advertisers such as Defendant.

---

[21] BigCommerce Help Center, *Meta Pixel*, https://support.bigcommerce.com/articles/en_US/Knowledge/Meta-Pixel (last visited Oct. 27, 2026).

[22] Meta for Developers, *Conversions API Gateway*, https://developers.facebook.com/documentation/ads-commerce/gateway-products/conversions-api-gateway (last visited Oct. 27, 2026).

[23] Meta, *Meta Business Tools Terms*, https://www.facebook.com/legal/terms/businesstools (last visited Oct. 27, 2026).

***b. Background on the Google Ads Tag***

57. Google LLC ("Google") operates the world's largest search engine and the world's largest digital-advertising business. Google's parent, Alphabet Inc., reported $264.6 billion in Google advertising revenue in 2024, roughly three-quarters of its total revenue.[24]

58. Google provides advertisers with the Google tag and Google Tag Manager, through which advertisers deploy the Google Ads conversion-tracking and remarketing tag and Google Analytics on their websites.

59. Google explains that when a visitor arrives at a website, the tag reads or sets identifying cookies and reports the visitor's actions to Google so that Google can "record a conversion," attribute it to an advertisement, and add the visitor to "data segments" (remarketing lists) so that "[y]our ads are shown to people in this segment as they browse Google or partner websites."[25]

60. The Google Ads tag transmits, with each event, the full URL of the page the user is viewing, the page's title, the Google advertising account identifier, persistent user identifiers stored in Google cookies, and any "event parameters" the website operator has configured. On e-commerce sites, Google's dynamic remarketing parameters—"ecomm_pagetype," "ecomm_prodid," and "ecomm_totalvalue"—tell Google which product the user viewed and its

[24] Alphabet Inc., Form 8-K, Ex. 99.1, *Alphabet Announces Fourth Quarter and Fiscal Year 2024 Results* (Feb. 4, 2025), https://www.sec.gov/Archives/edgar/data/1652044/000165204425000010/googexhibit991q42024.htm (last visited Oct. 27, 2026) (reporting Google advertising revenue of $264.6 billion out of total revenue of $350.0 billion).

[25] Google Ads Help, *About conversion measurement*, https://support.google.com/google-ads/answer/1722022 (last visited Oct. 27, 2026); Google Ads Help, *About your data segments*, https://support.google.com/google-ads/answer/2453998 (last visited Oct. 27, 2026).

price, so that Google can show the user advertisements for that specific product on other websites and apps.

61. Google's "consent mode" is the mechanism by which a website operator tells Google whether the user has consented to advertising cookies, to the sending of user data to Google for advertising, and to personalized advertising. Every request to Google carries a "gcd" parameter encoding the consent status of each of these signals; the value "l" for a signal means that the website operator has not implemented consent mode for that signal at all, and Google treats the signal as granted.[26] A separate "npa" parameter set to "0" instructs Google that personalized advertising is permitted.[27]

62. Google's advertising policies prohibit advertisers from collecting user data "without appropriate disclosures" and require advertisers to obtain users' consent to the collection, sharing, and use of their personal data for the personalization of advertisements, and to "clearly identify each party that may collect, receive, or use end users' personal data."[28]

63. Google thus places the onus on website operators, including Defendant, to provide notice and obtain consent.

[26] Google Ads Help, *About consent mode*, https://support.google.com/google-ads/answer/10000067 (last visited Oct. 27, 2026); Google for Developers, *Consent mode*, https://developers.google.com/tag-platform/security/guides/consent (last visited Oct. 27, 2026); *see also* CookieHub, *Consent Mode v2 Signals*, https://docs.cookiehub.com/advanced/consent-mode-v2-signals (last visited Oct. 27, 2026) (explaining that the "gcd" parameter is sent with every hit to Google and that the value "l" signifies that "[t]he signal hasn't been set with consent mode").

[27] Google for Developers, *Privacy controls*, https://developers.google.com/tag-platform/security/guides/privacy (last visited Oct. 27, 2026).

[28] Google Ads Policy, *Data collection and use*, https://support.google.com/adspolicy/answer/6020956 (last visited Oct. 27, 2026); Google, *EU user consent policy*, https://www.google.com/about/company/user-consent-policy/ (last visited Oct. 27, 2026).

### *c. Background on the Microsoft Advertising UET Tag*

64. Microsoft Corporation ("Microsoft") operates the Bing search engine and the Microsoft Advertising platform. Microsoft provides advertisers with the Universal Event Tracking ("UET") tag, which Microsoft describes as a tag that "records what customers do on your website" so that "Microsoft Advertising starts collecting that data allowing you to track conversions (like purchases or leads) or target audiences using remarketing lists."[29]

65. The UET tag, loaded from bat.bing.com, transmits to Microsoft with each page load the URL of the page, the page's title, the page's keyword metadata, the referring page, the user's browser and screen characteristics, and persistent visitor and session identifiers that Microsoft stores in the "_uetvid" and "_uetsid" cookies and uses to recognize the user across sessions and to build remarketing audiences.

66. Microsoft's remarketing policies prohibit the creation of remarketing lists based on sensitive data, which includes HIPAA-covered information.[30]

### *d. Background on the TikTok Pixel*

67. TikTok Inc. ("TikTok") operates a social-media platform and offers advertising tools, including a website Pixel. TikTok describes its Pixel as "a piece of code that you can place on your website that allows you to share website events with TikTok," including "ViewContent,"

[29] Microsoft Learn, *Universal Event Tracking*, https://learn.microsoft.com/en-us/advertising/guides/universal-event-tracking (last visited Oct. 27, 2026).

[30] *Microsoft Advertising Help, UET technical safeguards for sensitive data*, https://help.ads.microsoft.com/#apex/ads/en/60301/2 (last visited Oct. 18, 2026).

"AddToCart," "InitiateCheckout," "AddPaymentInfo," and "Purchase" events carrying "content_ids," "content_type," "quantity," "value," and "currency" parameters.[31]

68. The TikTok Pixel transmits with each event the URL of the page, the user's browser user-agent string, and persistent "anonymous_id," session, and page-view identifiers that TikTok uses to recognize the user across sessions and to associate website activity with TikTok accounts.

69. TikTok's "Automatic Advanced Matching," when enabled by the website operator, "[a]utomatically identifies form fields on pages where the Pixel is installed," collects email addresses, telephone numbers, names, and addresses entered into those fields, hashes them with SHA-256 in the browser, and transmits them to TikTok so that TikTok can link the website activity to a TikTok user.[32]

70. As shown below, Defendant's TikTok Pixel requests carry "signal_diagnostic_labels" reporting on the presence or absence of "raw_auto_email," "raw_auto_phone," "hashed_email," and "hashed_phone" values—fields that are populated when Automatic Advanced Matching is enabled and that report "missing" on pages where the user has not yet typed an email address or telephone number.

71. Implementation of the TikTok Pixel requires the website owner to obtain a pixel identifier from TikTok, integrate the TikTok-provided code, and define the events to be tracked. As part of setting up the pixel, website owners must agree to TikTok's Business Products (Data) Terms, under which owners represent that they have provided notice to and obtained any legally

[31] TikTok for Business, *About TikTok Pixel*, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Oct. 27, 2026); TikTok for Business, *Standard events and parameters*, https://ads.tiktok.com/help/article/standard-events-parameters (last visited Oct. 27, 2026).

[32] TikTok for Business, *About Advanced Matching for Web*, https://ads.tiktok.com/help/article/advanced-matching-web (last visited Oct. 27, 2026); TikTok for Business, *How to set up Automatic Advanced Matching*, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching (last visited Oct. 27, 2026).

required consent from users before transmitting data to TikTok.[33] TikTok's policy framework thus places the onus on website owners, including Defendant, to ensure they comply with applicable privacy laws.

***e. Background on the Attentive Tag***

72. Attentive Mobile Inc. ("Attentive") operates an SMS and email marketing platform that it describes as "trusted by over 8,000 brands," built on an identity graph connecting "trillions of customer interactions," and offering "Attentive Signal" to "[i]dentify, understand, and engage more website visitors" and a "Single Customer ID" to "[r]ecognize the same customer across channels."[34]

73. Attentive provides its clients with the "Attentive tag," a JavaScript tag that "creates a unique visitor identifier and stores it as a cookie" and that captures "behavioral data, page view, product view, add to cart, and purchase events," together with "identify" calls carrying the visitor's telephone number and email address.[35] Attentive's cookies persist for more than a year and store,

[33] TikTok for Business, *TikTok Advertiser Tools and Related Terms*, https://ads.tiktok.com/help/article/tiktok-advertiser-tools-and-related-terms (last visited Oct. 27, 2026).

[34] Attentive, https://www.attentive.com/ (last visited Oct. 27, 2026); *Attentive Unveils AI-Powered Innovations,* Business Wire (Oct. 10, 2024), https://www.businesswire.com/news/home/20241010701123/en (last visited Oct. 27, 2026) (describing Attentive as "trusted by over 8,000 brands" and its identity graph as connecting "trillions of customer interactions").

[35] Attentive Help Center, *The Attentive tag*, https://help.attentive.com/hc/en-us/articles/10905920909460-The-Attentive-tag (last visited Oct. 27, 2026); Attentive, *Attentive Tag SDK*, https://docs.attentive.com/pages/developer-guides/sdks/attentive-tag-sdk (last visited Oct. 27, 2026).

among other things, the visitor's identifier, the email address and telephone number entered at checkout, and the referral source of each visit.[36]

74. Attentive also offers an "Enhanced Attentive Tag" that "uses server-side technology" and "runs from a subdomain of your website instead of loading from attentive.com." Attentive explains that "changing privacy restrictions and the use of ad blockers have made it harder to track customer behavior and attribute revenue," so running the tag from the client's own subdomain sets "more persistent first-party cookies" and lets Attentive "capture a higher volume of critical identifiers," including "telephone numbers, email addresses, IP addresses, user and device IDs."[37] Defendant deployed the Enhanced Attentive Tag at kdzhf.webeyecare.com.

75. Implementation of each of these trackers requires Defendant to obtain an account and identifier from the vendor, place the vendor's snippet in the Website's source code, and configure the events and parameters to be transmitted. Data is transmitted to these vendors only because Defendant chose to install and configure the trackers in this manner.

***f. Background on the Hotjar Tracking Code***

76. Hotjar Ltd., now a subsidiary of Contentsquare S.A.S. (together, "Hotjar"), operates a website analytics and session-replay platform that Contentsquare acquired in 2021 and subsequently integrated into Contentsquare's digital experience analytics platform. Hotjar provides businesses with tools to monitor and analyze visitors' interactions with their websites,

---

[36] Attentive Help Center, *Attentive cookies*, https://help.attentive.com/hc/en-us/articles/14615673918484-Attentive-cookies (last visited Oct. 27, 2026).

[37] Attentive Help Center, *The Enhanced Attentive Tag*, https://help.attentive.com/hc/en-us/articles/30256115019796-The-Enhanced-Attentive-Tag (last visited Oct. 27, 2026).

including "Heatmaps," which reveal where visitors click, move, and scroll, and "Recordings," which enable businesses to reconstruct individual visitors' browsing sessions.[38]

77. Hotjar collects this information through a JavaScript tracking code that its customers install on their websites. Once installed, the tracking code enables Hotjar to observe visitors' interactions with the website, including pages viewed, mouse movements, clicks, scrolling, and other behavioral events.

78. This information allows Hotjar to reconstruct visitors' browsing sessions and provide its customers with recordings showing how individual visitors navigated and interacted with the website. Hotjar's session-replay technology can also capture information concerning the contents and structure of webpages displayed to visitors, subject to the implementation of data-suppression controls.

79. Hotjar also employs persistent identifiers to recognize visitors across browsing sessions. Its _hjSessionUser_{site_id} cookie stores a unique Hotjar User ID that persists for approximately one year and permits Hotjar to associate a visitor's subsequent interactions with the same website with that visitor's earlier sessions.

80. Hotjar further provides an "Identify API," through which website operators can transmit additional information about their visitors, including unique account identifiers and user attributes.[39] Hotjar explains that this functionality allows it to associate information collected about a visitor with a persistent identifier and acknowledges that its technology can connect browsing

---

[38]Hotjar Help *Center, How do Recordings Work: Advanced Version*, https://help.hotjar.com/hc/en-us/articles/36820006445585-How-do-Recordings-Work-Advanced-Explanation (last visited Oct. 24, 2026).

[39]Hotjar Help *Center, Identify API Reference,* https://help.hotjar.com/hc/en-us/articles/36820006120721-Identify-API-Reference (last visited Oct. 24, 2026).

activity collected before a visitor identifies themselves with their subsequently established identity, thereby linking previously anonymous browsing sessions to an identifiable user.[40]

81. Hotjar's collection of visitor information is not limited to isolated clicks or aggregated website statistics. Its session-replay functionality is designed to capture and reconstruct individual browsing sessions, including visitors' interactions with webpage elements and the information displayed during those sessions.

82. Contentsquare's documentation explains that data suppression operates by removing potentially identifying information before a website's Document Object Model ("DOM") is transmitted to Contentsquare.

83. The documentation further states that most page-content suppression settings are disabled by default, except for specified categories of information, and that once a session has been transmitted, "there is no way to retrieve or suppress data."

84. Accordingly, the protection of sensitive information displayed on webpages depends in part on the website operator's implementation of the platform's data-suppression controls.[41]

85. Implementation of Hotjar requires the website operator to establish an account and install Hotjar's tracking code within the website's source code. Hotjar expressly identifies both a Hotjar account and access to the website's source code as prerequisites for installation.[42]

---

[40]Hotjar Help *Center, What is a Hotjar User ID,* https://help.hotjar.com/hc/en-us/articles/36820043878161-What-is-a-Hotjar-User-ID (last visited Oct. 24, 2026).

[41]Contentsquar*e Help Center, How to Suppress Collected Data*, https://support.contentsquare.com/hc/en-us/articles/37271680419345-How-to-suppress-collected-data (last visited Oct. 24, 2026).

[42]Hotjar Learn*ing, How to Install Hotjar,* https://learning.hotjar.com/path/getting-started-path/how-to-install-hotjar (last visited Oct. 24, 2026).

86. Defendant's deployment of Hotjar's tracking code therefore required an affirmative decision to integrate Hotjar's technology into the Website, thereby enabling the collection and transmission of visitors' interactions to Hotjar and Contentsquare.

87. The resulting transmissions occurred because Defendant installed the tracking technology on its Website, not because visitors independently chose to communicate with Hotjar.

## III. WEBSITE USERS' COMMUNICATIONS ARE INTERCEPTED BY THE WEBSITE'S TRACKING TECHNOLOGY WITHOUT CONSENT.

88. Defendant maintains and owns the Website and intentionally installed the Tracking Technology on the Website, allowing the providers of the Tracking Technology and other third-party trackers that may be present on the Website to intercept and to collect users' communications with the Website—including product-page requests identifying the prescription lens the user wears, cart and checkout activity, and the identifying information entered to purchase a prescription product—in real time.

89. Individuals who visit the Website are not required to create an account or to affirmatively accept any terms of use or privacy policy before browsing product pages, adding lenses to their cart, or proceeding through checkout, and are not presented with any terms of use, privacy policy, cookie banner, or other page where tracking activities are disclosed.

90. The Tracking Technology begins transmitting data to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar the moment the home page loads. An example of the home page as first loaded is reproduced below.




*Figure 1 — webeyecare.com home page at first load.*

91. Upon accessing the Website, the user is presented with a search bar, product-category navigation, and buttons labeled "Shop Now" and "Reorder My Contacts." Users proceed to product pages and into checkout before they have any opportunity to review any terms of service or privacy policy. An example of the product page for the "Biofinity 6 Pack," a monthly-replacement lens manufactured by CooperVision, is reproduced below.




*Figure 2 — Biofinity 6 Pack product page, offering supply selection, a subscription option, and the "Add to Cart" button.*

92. Users who add a lens to their cart and click through to checkout are presented with a multi-step checkout form that requires their first and last name, street address, ZIP code, city, state, telephone number, and email address; a shipping method; and payment-card information or a PayPal or Sezzle account, and that offers a "Use My Insurance" option for an additional $5.99 fee. No checkbox or other mechanism for assenting to Defendant's terms of use (the "Terms") or privacy policy (the "Privacy Policy") is presented at any step of checkout, and no link to either document appears anywhere on the checkout screens. Examples of the checkout pages are reproduced below.




*Figure 3 — Checkout "Contact & Shipping Address" step.*




*Figure 4 — Checkout "Payment" step*

93. The Tracking Technology is active on every page throughout the browsing, cart, and checkout flow and is set up to capture the contents of users' communications with the Website and transmit them to at least Meta, Google, Microsoft, TikTok, Attentive, and Hotjar.

94. Each of those trackers transmits, with every page load, the URL of the page the user is viewing (and, in the case of Google and Microsoft, its title) together with the user's persistent identifiers, so that the user's path through the Website—from the home page, to the category and product pages that name the lenses she has been prescribed, to the cart, checkout, and account pages—is disclosed to each of them page by page as she navigates it.

**a. *The Meta Pixel.***

95. The Meta Pixel fires on every page of the Website. On the home page alone, before the user has clicked anything, the Pixel transmitted a "PageView" event to www.facebook.com/tr reporting the page ("dl=https://webeyecare.com"), Defendant's pixel identifier ("id=279051588030112"), Meta's persistent "_fbp" browser identifier, the user's screen dimensions, and the BigCommerce integration parameter described above, as reproduced below.

▾ Query String Parameters View source View URL-encoded

| | |
|---|---|
| id | 279051588030112 |
| ev | PageView |
| dl | https://webeyecare.com |
| rl | |
| if | false |
| ts | 1792182272541 |
| iw | false |
| sw | 1600 |
| sh | 1000 |
| v | 2.9.419 |
| r | stable |
| a | plbigcommerce1.2 |
| ec | 0 |
| o | 28701 |
| aems | 0;0 |
| fbp | fb.1.1792182272540.395611300337592020 |
| eid | ob3_plugin-set_a40a676197ac6a61e6f2fc1ca55ec864df64f1ee4af57073aee67ece0dd2dabe |
| pm | 1 |
| hrl | aad036 |
| ler | empty |
| cdl | API_unavailable |
| plt | 301.09999990463257 |
| ups[pv] | {} |
| ups[rpv] | {} |
| it | 1792182272474 |
| coo | false |
| dpo | LDU |
| dpoco | 0 |
| dpost | 0 |
| cs_cc | 1 |
| cas | 7430536657034171,6559465770811912 |

*Figure 5 — Decoded query-string parameters of the Meta Pixel "PageView" request transmitted from the webeyecare.com home page.*

96. As constructed on the Website, the Meta Pixel transmits to Meta's servers at www.facebook.com/tr a "PageView" event as each page loads and a "ViewContent" event as each product page loads. As reproduced below, for every visitor to a product page, Defendant transmits to Meta:

**a.** The event, identifying the visitor's action as a product view ("ev=ViewContent"),

**b.** The page the visitor is on, reported in this request as the Website's root URL ("dl=https://webeyecare.com") and, in the companion Gateway request described below, as the full product-page URL,

**c.** The fact that the content viewed is a product ("cd[content_type]=product"),

**d.** The identity of the product, which Defendant has catalogued as item 2309 ("cd[contents]=[{"id":"2309","quantity":1}]"),

**e.** Meta's persistent browser identifier ("fbp=fb.1.1792182272540.395611300337592020"),

**f.** The e-commerce integration through which Defendant installed the Pixel ("a=plbigcommerce1.2"), and

**g.** The user's browser user-agent string and the referring page, among other data points.

| | |
|---|---|
| id | 279051588030112 |
| ev | ViewContent |
| dl | https://webeyecare.com |
| rl | |
| if | false |
| ts | 1792877893598 |
| iw | false |
| cd[content_type] | product |
| cd[contents] | [{"id":"4309","quantity":1}] |
| sw | 1512 |
| sh | 982 |
| v | 2.9.427 |
| r | stable |
| a | plbigcommerce1.2 |
| ec | 1 |
| o | 28701 |
| aems | 0;0 |
| fbp | fb.1.1792877395314.96093065086377542 |
| eid | ob3_plugin-set_84e8ac20042a6de9bfb1817d779aebf0b9251b0569ba02bb631322eb6276bbfc |
| pm | 1 |
| hrl | 2385ee |
| ler | empty |

*Figure 6 — Meta Pixel ViewContent request to www.facebook.com/tr from the Acuvue Oasys 1-Day 90 Pack product page, showing the full request URL.*

**Query String Parameters** View source View URL-encoded

| | |
|---|---|
| id | 279051588030112 |
| ev | ViewContent |
| dl | https://webeyecare.com |
| rl | |
| if | false |
| ts | 1792182278067 |
| iw | false |
| cd[content_type] | product |
| cd[contents] | [{"id":"2309","quantity":1}] |
| sw | 1600 |
| sh | 1000 |
| v | 2.9.419 |
| r | stable |
| a | plbigcommerce1.2 |
| ec | 1 |
| o | 28701 |
| aems | 0;0 |
| fbp | fb.1.1792182272540.395611300337592020 |
| eid | ob3_plugin-set_dde88310eb0c84a1852d4d1fa0e7b0ca5ac7ca1770fb0c45384339b8617f4b71 |
| pm | 1 |
| hrl | 79209d |
| ler | empty |
| cdl | API_unavailable |
| plt | 866.2999999523163 |
| ups[pv] | {} |
| ups[rpv] | {} |
| it | 1792182278036 |
| coo | false |
| dpo | LDU |
| dpoco | 0 |
| dpost | 0 |

*Figure 7 — Decoded query-string parameters of the same ViewContent request, including cd[content_type] and cd[contents].*

97. Meta allows advertisers to upload a "catalog" to Meta: a structured database describing each product the advertiser sells, in which every item is assigned a unique identifier and accompanied by its title, description, brand, price, image, and product-page URL.[43]

[43] *See* Meta for Developers, *Catalog, https://developers.facebook.com/documentation/ads-commerce/catalog (last* visited Oct. 24, 2026); Meta for Developers, *Catalog Overview,* https://developers.facebook.com/documentation/ads-commerce/catalog/overview (last visited Oct. 24, 2026).

98. Meta uses the catalog to run "dynamic" advertisements that show a user the specific products he or she viewed or added to a cart on the advertiser's website.[44]

99. The "contents" parameter therefore tells Meta precisely which product the user is looking at. Meta's documentation instructs advertisers to populate it with the product identifiers in the advertiser's catalog so that Meta can match the event to the corresponding catalog item and show the user advertisements for that product.[45]

100. Because the same ViewContent request identified the content as a "product" ("cd[content_type]=product"), and the duplicate of that event that the user's browser sent to Defendant's Conversions API Gateway, described below, carried the full URL of the concurrently-viewed Acuvue Oasys 1-Day 90 Pack product page, item 2309 must correspond, in the product catalog Defendant maintains with Meta, to the Acuvue Oasys 1-Day 90 Pack.

101. Meta thus learns not merely that a user visited Defendant's website, but that this specific, identified user—matched to his or her Facebook account through the _fbp cookie and hashed identifiers described above—viewed a particular prescription contact-lens product, and, through the catalog, the product's brand, name, and price.

102. Upon information and belief, the same Pixel transmits "AddToCart," "InitiateCheckout," "AddPaymentInfo," and "Purchase" events as the user progresses from the product page through checkout, each carrying the product identifiers, quantity, value, and currency of the prescription lenses selected, and transmits hashed advanced-matching identifiers—the user's first name, last name, and email address—for every event where this data is available.[46]

---

[44] *See* Meta for Developers, *Dynamic Product Audiences*, https://developers.facebook.com/documentation/ads-commerce/marketing-api/audiences/guides/dynamic-product-audiences (last visited Oct. 24, 2026).

[45] *See* Meta for Developers, *Meta Pixel — Reference, supra* n. 19.

[46] *See* BigCommerce Help Center, *Meta Pixel, supra* n. 21.

### *b. The Meta Conversions API Gateway.*

103. The same browser event that sent the ViewContent request to Meta also sent a duplicate of that event, by HTTP POST, to Defendant's Conversions API Gateway. The request headers and the decoded payload are reproduced below.

▾ General

| | |
|---|---|
| Request URL | https://capig.webeyecare.com/events/58f90f2545f474a2313c56cfa6e28afdc587a5045d03747d6ed1d4c0433ec96d |
| Request Method | POST |
| Status Code | 200 OK |
| Remote Address | :80 |

▾ Response headers

| | |
|---|---|
| Access-Control-Allow-Credentials | true |
| Access-Control-Allow-Origin | https://webeyecare.com |
| Content-Length | 0 |
| Content-Security-Policy | default-src 'none' |
| Content-Type | application/json |
| Date | Fri, 16 Oct 2026 20:24:38 GMT |
| Set-Cookie | cee=kRgFf12y36r8Ne5q%2Bhn%2BBmCuKHOrVhZODTq6TwH3Poc%3D.%7B%7D; Max-Age=7776000; Expires=Thu, 14 Jan 2027 20:24:38 GMT; Path=/events/58f90f2545f474a2313c56cfa6e28afdc587a5045d03747d6ed1d4c0433ec96d; Domain=capig.webeyecare.com; Secure; HTTPOnly; SameSite=None |
| Vary | origin |

*Figure 8 — POST to Defendant's Conversions API Gateway at capig.webeyecare.com, showing the Set-Cookie header placing a 90-day "cee" cookie on Defendant's subdomain.*

▾ Request Payload View source


```
▾ {event_name: "ViewContent",…}
  ▾ custom_data: {content_type: "product", contents: [{id: "2309", quantity: 1}]}
      content_type: "product"
    ▾ contents: [{id: "2309", quantity: 1}]
      ▾ 0: {id: "2309", quantity: 1}
          id: "2309"
          quantity: 1
    event_id: "ob3_plugin-set_dde88310eb0c84a1852d4d1fa0e7b0ca5ac7ca1770fb0c45384339b8617f4b71"
  ▾ event_meta_info: {cc_info: {cas: "25199448973035939,6559465770811912,9564565890282041"}}
    ▾ cc_info: {cas: "25199448973035939,6559465770811912,9564565890282041"}
        cas: "25199448973035939,6559465770811912,9564565890282041"
    event_name: "ViewContent"
  ▾ fb.data_processing_options: {dataProcessingOptions: ["LDU"], dataProcessingOptionsCountry: 0, dataProcessingOptionsState: 0]
    ▸ dataProcessingOptions: ["LDU"]
      dataProcessingOptionsCountry: 0
      dataProcessingOptionsState: 0
  ▾ fb.dynamic_product_ads: {content_type: "product", contents: [{id: "2309", quantity: 1}]}
      content_type: "product"
    ▾ contents: [{id: "2309", quantity: 1}]
      ▾ 0: {id: "2309", quantity: 1}
          id: "2309"
          quantity: 1
    fb.fbp: "fb.1.1792182272540.395611300337592020"
    fb.pixel_id: "279051588030112"
  ▾ website_context: {location: "https://webeyecare.com/acuvue-oasys-1-day-90-pack/", referrer: "", isInIFrame: false}
      isInIFrame: false
      location: "https://webeyecare.com/acuvue-oasys-1-day-90-pack/"
      referrer: ""
```


*Figure 9 — Decoded JSON payload of the Gateway request, carrying event_name "ViewContent," the product identifier, the fb.fbp identifier, fb.pixel_id, and the full product-page URL.*

104. As seen in the request above, Defendant's Gateway transmits, among other data points:

**a.** The event name ("event_name: 'ViewContent'"),

**b.** The product identifier and quantity ("content_type: 'product'"; "contents: [{id: '2309', quantity: 1}]"),

**c.** Defendant's Meta pixel identifier ("fb.pixel_id: '279051588030112'"),

**d.** The same Meta browser identifier that the Pixel sent to facebook.com ("fb.fbp: 'fb.1.1792182272540.395611300337592020'"), so that Meta can join the two transmissions, and

**e.** The full URL of the product page, which itself names the prescription lens the user is viewing ("location: 'https://webeyecare.com/acuvue-oasys-1-day-90-pack/'").

105. Because the Gateway runs on a subdomain of webeyecare.com, the user's browser attached to the request every cookie set on the webeyecare.com domain, including the identifying tokens by which each of Meta, Google, Microsoft, TikTok, Attentive, and Hotjar recognizes the same user. Upon information and belief, Defendant's Gateway then forwards the event to Meta's Conversions API server-to-server, from infrastructure Defendant itself provisions and controls.

***c. The Google Ads Tag.***

106. Defendant also deploys the Google Ads tag through Google Tag Manager, as the "scrsrc=www.googletagmanager.com" parameter reflects, under Defendant's Google Ads account identifier "AW-1060455475."

107. On the same product page, that tag transmitted a request by HTTP POST to https://www.google.com/ccm/collect. The decoded parameters are reproduced below.

▾ **Query String Parameters** View source View URL-encoded

| | |
|---|---|
| rcb | 15 |
| frm | 0 |
| apvc | 0 |
| ae | g |
| auid | 1838264383.1792182275 |
| dt | Buy Acuvue Oasys 1 Day 90 Pack with Hydraluxe Daily Contacts |
| tid | AW-1060455475 |
| dl | https://webeyecare.com/acuvue-oasys-1-day-90-pack/ |
| scrsrc | www.googletagmanager.com |
| rnd | 991474081.1792182275 |
| navt | n |
| npa | 0 |
| ep.ecomm_pagetype | product |
| ep.ecomm_totalvalue | $95.95 |
| epn.ecomm_prodid | 1829 |
| _tu | CA |
| gtm | 45be6af0h2v9179051408z876617828za20gzb76617828zd76617828xeaxf1 |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 115938465~115938469~117776795~118131808~118897920~118897930~120213116~120385423~120469145~120469153~121246026~121246034~121284208 |
| tft | 1792182275391 |
| tfd | 963 |
| _gsid | W9YafeihyCW9kBabnYCoqKxoyPFt3jaVbQ |
| tids | AW-1060455475 |
| fmt | 8 |

*Figure 10 — Decoded parameters of the Google Ads tag request to www.google.com/ccm/collect from the Acuvue Oasys product page.*

108. This request shows that, for every visitor to a product page, Defendant transmits to Google:

a. The title of the page ("dt=Buy Acuvue Oasys 1 Day 90 Pack with Hydraluxe Daily Contacts"),

b. The full URL of the page ("dl=https://webeyecare.com/acuvue-oasys-1-day-90-pack/"),

c. The type of page ("ep.ecomm_pagetype=product"),

d. The product ID ("epn.ecomm_prodid=1829"),

e. The product's cost ("ep.ecomm_totalvalue=$95.95"),

f. A persistent Google user identifier ("auid=1838264383.1792182275"), the value of Google's "_gcl_au" cookie,

g. A flag instructing Google that personalized advertising is permitted ("npa=0"), and

h. The consent-mode signal (“gcd=13l3l3l3l1l1”), which, upon information and belief, reports that Defendant has not implemented Google’s consent mode for any advertising or analytics signal, so that Google treats each signal as granted.

109. Defendant’s Google tags also report users’ interactions with the Website’s forms. As reflected in the network log reproduced below, Defendant’s Google Ads tag transmitted “form_start” and “form_submit” events to Google’s conversion-tracking endpoint under account 1060455475 as the user began and submitted a form on the Website—so that Google learns not only which prescription lens the user viewed but when the user begins entering, and submits, the personal information that the Website’s forms collect.

110. Defendant’s Google Analytics property likewise transmitted page and event data to Google’s analytics servers throughout the visit.

| | |
|---|---|
| 1060455475/?random=1792182290483&cv=11&fst=1792182...=event%3Dform_start&gap.fsrc=1&... | 200 |
| 1060455475/?random=1792182290483&cv=11&fst=1792182...0&data=event%3Dform_start&gap.... | 200 |
| 1060455475/?random=1792182290491&cv=11&fst=1792182...event%3Dform_submit&gap.fsrc=2... | 200 |
| 1060455475/?random=1792182290491&cv=11&fst=1792182...&data=event%3Dform_submit&gap.... | 200 |

*Figure 11 — Network log entries showing “form_start” and “form_submit” events transmitted by the Google Ads tag (account 1060455475).*

### *d. The Microsoft UET Tag.*

111. On the same product page, Defendant's Microsoft UET tag transmitted a request to https://bat.bing.com/action/0. The decoded parameters are reproduced below.

▾ Query String Parameters View source View URL-encoded

| | |
|---|---|
| ti | 5215526 |
| tm | gtm002 |
| Ver | 2 |
| mid | 92213ab7-c5a8-4e95-b747-aad125cc259a |
| bo | 1 |
| sid | 9a8b58e0c99f11f1aba0fba77cc59f71 |
| vid | 9a8b7f50c99f11f18b445ffb2fdc2291 |
| vids | 1 |
| msclkid | N |
| uach | pv=10.0 |
| pi | 918639831 |
| lg | en-US |
| sw | 1600 |
| sh | 1000 |
| sc | 30 |
| nwd | 1 |
| tl | Buy Acuvue Oasys 1 Day 90 Pack with Hydraluxe Daily Contacts |
| kw | 1-day acuvue,daily,disposable,acuvue,trueye,1,day,johnson,acuview,acuvie,1-day acuvue trueye |
| p | https://webeyecare.com/acuvue-oasys-1-day-90-pack/ |
| r | |
| lt | 866 |
| evt | pageLoad |
| sv | 2 |
| cdb | ARoR |
| rn | 223764 |

*Figure 12 — Decoded parameters of the Microsoft UET request to bat.bing.com/action/0 from the Acuvue Oasys product page.*

112. As seen in the request above, the Website transmitted to Microsoft the details of the customer's interaction with the page visited, including:

**a.** The title of the page ("tl=Buy Acuvue Oasys 1 Day 90 Pack with Hydraluxe Daily Contacts"),

**b.** The page's URL ("p=https://webeyecare.com/acuvue-oasys-1-day-90-pack/"),

**c.** The page's keyword metadata ("kw=1-day acuvue,daily,disposable,acuvue,trueye,1,day,johnson,acuview,acuvie,1-day acuvue trueye"), and

**d.** Microsoft's persistent visitor identifier ("vid=9a8b7f50c99f11f18b445ffb2fdc2291").

***e. The TikTok Pixel.***

113. On the same product page, Defendant's TikTok Pixel, operating under Defendant's pixel code "CA3K2SJC77U0Q8NJGB70," transmitted a "Pageview" event by HTTP POST to https://analytics.tiktok.com/api/v2/pixel. The decoded payload is reproduced below.


```
▾ Request Payload   View source
▾ {event: "Pageview", event_id: "",…}
  ▾ context: {ad: {sdk_env: "external", jsb_status: 2}, device: {platform: "pc"},…}
    ▾ ad: {sdk_env: "external", jsb_status: 2}
        jsb_status: 2
        sdk_env: "external"
      csct: 1
      csid: "1792182278111::ndSmmU64xPImwa33S0RV"
      css: 1
    ▾ device: {platform: "pc"}
        platform: "pc"
    ▾ library: {name: "pixel.js", version: "2.2.1"}
        name: "pixel.js"
        version: "2.2.1"
    ▾ page: {url: "https://webeyecare.com/acuvue-oasys-1-day-90-pack/", referrer: "", load_progress: "2"}
        load_progress: "2"
        referrer: ""
        url: "https://webeyecare.com/acuvue-oasys-1-day-90-pack/"
      page_csid: "1792182278111::q_RdGMpAQbmlg9S9kva3"
      pageview_id: "9c04ef45-c99f-11f1-8062-aa5a4b3857fa-C35r2.0.0::9c04dc07-c99f-11f1-8062-aa5a4b3857fa-CA3K2SJC77U0Q8NJGB70"
    ▾ pixel: {code: "CA3K2SJC77U0Q8NJGB70", runtime: "1"}
        code: "CA3K2SJC77U0Q8NJGB70"
        runtime: "1"
      session_id: "9c04ef45-c99f-11f1-8062-aa5a4b3857fa::jZT5bH2ZP7y28OH50OZh-CA3K2SJC77U0Q8NJGB70"
    ▸ user: {anonymous_id: "01M5366NYV9HS9XFSKSFRK0M8S_.tt.1.1792182278107"}
      userAgent: "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/145.0.0.0 Safari/537.36"
      variation_id: "default"
    event: "Pageview"
    event_id: ""
    is_onsite: false
    message_id: "messageId-1792182278113-4042244164744-CA3K2SJC77U0Q8NJGB70"
    properties: {}
  ▾ signal_diagnostic_labels: {raw_email: {label: "missing"}, raw_auto_email: {label: "missing"}, raw_phone: {label: "missing"},…}
    ▾ hashed_eb_email: {label: "missing"}
        label: "missing"
    ▾ hashed_eb_phone: {label: "missing"}
        label: "missing"
    ▸ hashed_email: {label: "missing"}
    ▾ hashed_phone: {label: "missing"}
        label: "missing"
    ▾ raw_auto_email: {label: "missing"}
        label: "missing"
    ▾ raw_auto_phone: {label: "missing"}
        label: "missing"
    ▸ raw_eb_email: {label: "missing"}
    ▾ raw_eb_phone: {label: "missing"}
        label: "missing"
    ▸ raw_email: {label: "missing"}
    ▾ raw_phone: {label: "missing"}
        label: "missing"
    timestamp: "2026-10-16T20:24:38.113Z"
  ▸ _inspection: {vids: "76936273,77232232", inter_id: "1.-3683.0::0.0.0.0::0.0.0"}
```


*Figure 13 — Decoded payload of the TikTok Pixel request to analytics.tiktok.com/api/v2/pixel from the Acuvue Oasys product page, including the page URL, pixel code, anonymous_id, user-agent string, and signal_diagnostic_labels.*

114. As seen in the request above, the Website transmitted to TikTok:

**a.** The URL of the product page ("url: 'https://webeyecare.com/acuvue-oasys-1-day-90-pack/'"),

**b.** Defendant's TikTok pixel code ("code: 'CA3K2SJC77U0Q8NJGB70'"),

**c.** The user's full browser user-agent string ("userAgent: 'Mozilla/5.0 (Windows NT 10.0; Win64; x64) . . .'"),

**d.** A persistent TikTok visitor identifier ("anonymous_id: '01M5366NYV9HS9XFSKSFRK0M8S_.tt.1.1792182278107'"), together with session and page-view identifiers ("session_id," "pageview_id"),

**e.** A millisecond-resolution timestamp ("timestamp: '2026-10-16T20:24:38.113Z'"), and

**f.** A "signal_diagnostic_labels" object reporting the status of "raw_auto_email," "raw_auto_phone," "hashed_email," "hashed_phone," and related fields, each "missing" on the product page, where no form had yet been completed.

115. Upon information and belief, those "signal_diagnostic_labels" are generated by TikTok's Automatic Advanced Matching feature, which Defendant has enabled, and on the checkout and account sign-up pages where the user enters her email address and telephone number, the same mechanism collects those identifiers, hashes them, and transmits them to TikTok.

116. The TikTok Pixel additionally transmitted multiple requests to its "/api/v2/pixel/act" endpoint during the visit, through which, upon information and belief, TikTok records the user's clicks and other interactions with the page.

***f. The Attentive Tag.***

117. On the same product page, Defendant's Enhanced Attentive Tag transmitted a "ProductView" event by HTTP POST to https://kdzhf.webeyecare.com/sst-ev, a subdomain of webeyecare.com. The request headers and the decoded form data are reproduced below.

| ▾ General | |
|---|---|
| Request URL | https://kdzhf.webeyecare.com/sst-ev |
| Request Method | POST |
| Status Code | ● 200 OK |
| Remote Address | 104.18.39.67:80 |

*Figure 14 — POST to the Attentive server-side tagging endpoint at kdzhf.webeyecare.com/sst-ev.*

ource View URL-encoded

{"visitorId":"27706ab36bfe4d12b552eefb3ff58504","version":"2026.10.1_ec0b9de6447","attentiveDomain":"webeyecare","sourceType":"sst","locationHref":"https://webeyecare.com/acuvue-oasys-1-day-90-pack/","referrer":"","sessionId":"5f240db629194ae5a3d4213ab8ee5ce8","configVersion":"4","eventType":"ProductView","identifiers":{"otherIdentifiers":[{"idType":"AttnEatId","value":"8beb2115165c424093d05abb99ebc568"}]},"eventMetadata":{"eventType":"ProductView","product":{"productId":"1829","name":"Acuvue Oasys 1-Day 90 Pack","imageUrl":"https://cdn11.bigcommerce.com/s-fu16hs0usz/products/1829/images/5045/acuvue_1_day__94373.1642497902.386.513.jpg?c=1","categories":["Contacts"],"price":"95.95","quantity":1},"currency":"USD"},"genericMetadata":{},"adblockerStatus":"none"}

*Figure 15 — Decoded form data of the Attentive request, carrying eventType "ProductView," the product name "Acuvue Oasys 1-Day 90 Pack," category "Contacts," price, the page URL, and Attentive visitor, session, and "AttnEatId" identifiers.*

118. As seen in the request above, the Website transmitted to Attentive, in a JSON object:

**a.** Defendant's Attentive account and the server-side source of the event ("attentiveDomain: 'webeyecare'"; "sourceType: 'sst'"),

**b.** The event type ("eventType: 'ProductView'"),

**c.** The full URL of the product page ("locationHref: 'https://webeyecare.com/acuvue-oasys-1-day-90-pack/'"),

**d.** The product, by Defendant's product identifier, name, category, price, quantity, and currency ("productId: '1829'"; "name: 'Acuvue Oasys 1-Day 90 Pack'"; "categories: ['Contacts']"; "price: '95.95'"; "quantity: 1"; "currency: 'USD'"),

**e.** A persistent Attentive visitor identifier ("visitorId: '27706ab36bfe4d12b552eefb3ff58504'") and a session identifier ("sessionId"), and

**f.** An Attentive identity token ("AttnEatId: '8beb2115165c424093d05abb99ebc568'").

119. The request also carried Attentive's "__attentive_id," "_attn_," "__attentive_session_id," and "__attentive_ss_referrer=ORGANIC" cookies, together with every other advertising cookie set on the webeyecare.com domain. Attentive thus received, by name, the prescription lens the user was viewing, linked to identifiers that Attentive maintains for more than a year and that it associates with the telephone number and email address the user later enters at checkout, on the account sign-up page, or in Attentive's SMS sign-up prompt.[47]

[47] *See Attentive cookies, supra* n. 36.

120. As the screenshots above show, the Meta, Google, Microsoft, TikTok, Attentive, and Hotjar trackers capture the product-page requests, page titles, product identifiers, and prices that reveal the prescription lenses users view and purchase, together with persistent identifiers that each of these companies uses to recognize the same person across the web and transmit this data to those third parties.

121. Therefore, individuals who use the Website are tracked and uniquely identified through the third parties' capture of their identifying characteristics—including, at checkout, their email addresses and telephone numbers—as well as through methods of identifying users like Meta's, TikTok's, and Attentive's hashed-identifier and identity-graph matching.

***g. The Hotjar Session-Replay Script.***

122. Defendant also embeds on the Website Hotjar's session-replay script, under Defendant's Hotjar site identifier "464290." The trackers described above report discrete events. Hotjar's script instead records the user's session itself. It copies the content of the page the user sees, including information the Website displays back to the user, and streams it to Hotjar's servers in real time along with the user's clicks, taps, scrolling, selections, and keystrokes, so that the session can later be replayed.

123. The script loads from static.hotjar.com and opens a persistent WebSocket connection to wss://ws.hotjar.com/api/v2/client/ws?v=7&site_id=464290. Over that connection it transmits a continuous stream of messages for as long as the user remains on the page. Each message carries Hotjar's identifiers for the user and session ("uuid" and "sid"). The first message in the stream ("recording_helo") reports to Hotjar:

a. The URL of the page ("page_url"),

b. The referring page ("referrer"),

c. The user's full browser user-agent string and language ("user_agent"; "accept_language: 'en-US'"), and

d. The dimensions of the user's screen ("window_width"; "window_height").

124. Users who buy prescription eyeglasses on the Website choose a frame and are then taken through a multi-step prescription form. A user selects, for each eye, the sphere power, cylinder, axis, and add of her prescription, along with her pupillary distance. She then types the patient's name, the name of the prescribing doctor or clinic, and the doctor's telephone number. The form itself tells users that contact lenses and glasses are medical devices that require a prescription.

125. Hotjar recorded each step of that form as the user completed it. The Website transmitted to Hotjar:

a. Each click and tap, identified by the page element clicked, including the user's choice to enter her prescription,

b. Each selection the user made in the prescription form's dropdown menus ("select_change"), identifying the prescription field and the value chosen. For example, Hotjar receives the right-eye axis ("selector: '#Axis (OD)'") and the left-eye axis ("selector: '#Axis (OS)'"),

c. A separate event for each keystroke the user typed into the "Patient Name," "Doctor/Clinic Name," and "Doctor Phone" fields, each with a millisecond-resolution timestamp, sent to Hotjar's analytics endpoint at content.hotjar.io/cs/analytics/v2/events, and

d. A "forminteract" event tagging the user's interaction with the prescription form itself.

126. When the user finishes entering her prescription, the Website displays a "Review & Confirm" screen that addresses her by name and asks her to confirm the prescription. Hotjar's script copied that screen as rendered text and transmitted it to Hotjar. The transmission contains, in plain text:

a. The patient's name, in a greeting addressed to the user ("Hello, [FIRST LAST], Please confirm your prescription:"),

b. The user's complete prescription for each eye: for the right eye ("OD"), power, cylinder, axis, and add; and the same for the left eye ("OS"), and

c. The name of the prescribing doctor ("Doctor/Clinic Name: [DOCTOR]").

127. Hotjar does not merely store this information for Defendant. Under the master service agreement governing Hotjar's services, Hotjar's customers grant Contentsquare and its affiliates a perpetual, worldwide, royalty-free license to compile, access, and use the data Hotjar collects, which the agreement defines to include data about website visitors, to research, develop, modify, and improve Contentsquare's own services. They also grant Contentsquare the right to use that data for benchmarking and machine learning, and for Contentsquare's other internal business purposes. Hotjar's service terms further permit Contentsquare to import the visitor data collected through Hotjar into Contentsquare's separate analytics platform.

128. Hotjar's own terms confirm that Defendant should never have transmitted this information. The agreement limits the visitor data Hotjar is meant to process to technical and behavioral data such as IP addresses, cookie identifiers, and browsing behavior. It requires customers to block any other personal data, including data a visitor types in or data displayed within the page. Defendant did not. It allowed Hotjar to capture the very categories of information—a patient's name, her prescription, and her physician—that Hotjar's terms required Defendant to keep from it.

129. Hotjar thus received, linked to its persistent identifiers for the user, a replayable record of a named patient's eyeglass prescription and the doctor who wrote it, captured in real time as the user entered it.

## IV. USERS DO NOT GIVE INFORMED CONSENT TO DEFENDANT'S PRIVACY POLICY OR TERMS.

130. Users do not consent to the Privacy Policy or Terms because they are never shown them: nothing in the customer journey, whether a user purchases lenses or creates an account, requires or invites the user to find either document.

131. The only references to the Privacy Policy and Terms anywhere on the Website are hyperlinks in the footer at the very bottom of the webeyecare.com pages.

132. On the home page and product pages, the footer sits beneath the hero banner, the product listings, the promotional sections, the reviews, and the FAQ—multiple screens below the point at which the page first loads on a standard desktop or mobile display. The "Shop Now," "Add to Cart," and "Checkout" buttons, by contrast, appear at the top of the page, above the fold.

133. A user who clicks "Add to Cart" and proceeds to checkout is taken through the entire purchase without ever scrolling past, let alone to, the footer. The checkout pages (Figs. 3–4) contain no link to either document at all.

134. The same is true when a user creates an account. Defendant's account sign-up page asks a "New Customer" only for an email address, a password, and a confirmation of that password; pre-checks a box reading "Subscribe to our newsletter"; and presents a "Create account" button, alongside options to "Sign-in with Google" or "Sign-in with Facebook."

135. The page contains no link to the Privacy Policy or Terms, no checkbox or statement of assent to either document, and no disclosure of any tracking. An image of the account sign-up page is reproduced below.




*Figure 16 — Account sign-up page ("New Customer"), with no link to the Terms or Privacy Policy and a pre-checked newsletter subscription.*

136. At no point in the browsing, cart, checkout, or account-creation flow is the user required to scroll to the bottom of any page, to click any link to the Privacy Policy or Terms, to check a box, or to take any other action that would bring either document to her attention.

137. No screen states that by continuing, purchasing, or creating an account the user agrees to either document. The Tracking Technology, meanwhile, has been transmitting the user's activity to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar since the moment the first page loaded.

138. Under these circumstances, no user manifests assent to the Privacy Policy or Terms, and no user knew or should have known that her communications with the Website were being contemporaneously acquired by Meta, Google, Microsoft, TikTok, Attentive, and Hotjar.

139. Consent to the interception, disclosure, and use of Plaintiff's and Class members' communications was therefore never sought and never given.

## V. THE INTERCEPTED INFORMATION IS SENSITIVE, AND DEFENDANT'S INTENTIONAL INTERCEPTION OF THIS INFORMATION WAS CRIMINAL AND TORTIOUS.

140. A contact lens is a prescription medical device. The product page a user views on the Website is the page for the lens a licensed prescriber has written for that user's eyes, and the Website's product taxonomy—daily, bi-weekly, and monthly lenses; toric lenses for astigmatism; multifocal lenses for presbyopia—maps directly onto the user's diagnosed condition.

141. The purchase of such a lens is the purchase of a prescribed medical treatment, completed only after Defendant verifies the prescription with the user's eye doctor and, for users who elect it, is submitted to the user's vision-insurance plan as a benefits claim.

142. Information about one's body and state of health, and about the medical treatment one receives for it, is matter that an individual is ordinarily entitled to keep to herself. A person who orders prescription lenses online has not disclosed to the world, or to Meta, that she wears corrective lenses, which lens she wears, or that she has astigmatism; she has disclosed those facts to the seller filling her prescription, for the purpose of having it filled.

143. Each transmission described above carried persistent identifiers—Meta's "_fbp," Google's "auid" (the value of its "_gcl_au" cookie), Microsoft's "_uetvid," TikTok's "anonymous_id," and Attentive's "visitorId" and "AttnEatId"—by which the receiving company recognizes the same individual across the websites and apps on which it operates, and, upon information and belief, the checkout transmissions additionally carry hashed email addresses and telephone numbers through Meta's advanced matching, TikTok's Automatic Advanced Matching, Attentive's identify calls, and Hotjar's Identify API and persistent User ID. There is, at minimum, a reasonable basis to believe that each receiving company can and does associate the prescription product viewed and purchased with the identity of the person who viewed and purchased it.

144. Defendant's disclosures of that information to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar were not made to fill the user's prescription, to process her payment, or to ship her order. They were made for marketing: to measure the performance of Defendant's advertising, to attribute purchases to particular campaigns, to build audiences of people who wear particular lenses, to retarget those people with advertisements for those lenses on Facebook, Instagram, Google, Bing, and TikTok, and to enroll them in Attentive's SMS and email marketing programs. Each disclosure was undertaken for Defendant's commercial advantage.

145. Defendant installed and configured the Tracking Technology for that very purpose. The Meta Pixel and Conversions API Gateway, the Google Ads tag, the Microsoft UET tag, the TikTok Pixel, and the Attentive tag have no function other than to disclose website visitors' activity to the companies that operate them so that those companies can use it for advertising and marketing. The interception of Plaintiff's and Class members' communications was therefore not an end in itself; it was the means by which Defendant accomplished separate and subsequent unlawful acts—the disclosure and use of Plaintiff's and Class members' communications, and of the identities and prescription products they revealed, for commercial advantage—that Defendant intended from the moment it placed the tracking code on the Website.

146. Those separate and subsequent acts are criminal and tortious under Pennsylvania law. Intentionally disclosing to another person the contents of an electronic communication, and intentionally using those contents, knowing or having reason to know that the information was obtained through an interception made without the prior consent of all parties, are each a felony of the third degree under 18 Pa.C.S. § 5703(2) and (3), independent of the interception offense defined in § 5703(1). Acquiring and disclosing a person's prescription product and identity without her knowledge is the tort of intrusion upon seclusion. Soliciting a consumer's prescription,

insurance, and identifying information in a "Secure Checkout" while routing her product selections and identifiers to six advertising and marketing companies—and publishing a privacy policy that promises not to—is deceptive conduct creating a likelihood of confusion or misunderstanding in violation of the UTPCPL, 73 P.S. § 201-2(4)(xxi), and an unfair practice under Section 5 of the FTC Act as the FTC has interpreted it in its GoodRx and BetterHelp actions and its July 2023 joint guidance.

147. Defendant was on notice that its conduct was unlawful. The FTC's GoodRx action, the FTC–HHS joint letter, and the FTC's 2024 amendments to the Health Breach Notification Rule all predate Plaintiff's use of the Website. Defendant nonetheless deployed the Tracking Technology on every page of the Website, including the product and checkout pages.

## VI. REPRESENTATIVE PLAINTIFF'S EXPERIENCE.

148. In or around January 2025, while living and physically present in Munhall, Pennsylvania, Plaintiff accessed the Website to purchase the prescription contact lenses she had been prescribed by her eye-care provider.

149. During this visit, Plaintiff viewed the product pages for the specific brand and type of lens she wears, selected the supply and quantity, added the lenses to her cart, and proceeded through Defendant's checkout, which required her to enter her name, shipping and billing address, email address, and telephone number, to select a shipping method, and to enter payment-card information, and in connection with which Plaintiff supplied the prescription parameters for each eye and the name of her prescriber so that Defendant could verify the prescription. Plaintiff completed the purchase. The Meta, Google, Microsoft, TikTok, Attentive, and Hotjar requests described above fired on each page Plaintiff visited, transmitting the URL of that page (and, as to

Google and Microsoft, its title)—including the product pages naming the lens she wears—together with the identifiers described above.

150. Defendant verified Plaintiff's prescription and shipped the contact lenses to Plaintiff's home in Munhall, Pennsylvania.

151. At no point before or during this process was Plaintiff provided with any notice or means to consent (*i.e.*, a link to Defendant's Terms or Privacy Policy presented for her review and affirmative acceptance) to her product selections, checkout information, and purchase being recorded and transmitted to third parties. Nor was she provided with any notice that this recording was taking place.

152. Plaintiff did not click on, view, or otherwise access any hyperlinks to Defendant's Terms, Privacy Policy, or any similar page during the visit. Plaintiff proceeded from the Website's product pages through the cart and checkout by clicking the action buttons presented on each screen; she did not scroll to the footer of the webeyecare.com pages, and the references to the Terms and Privacy Policy were not displayed to her.

153. Plaintiff was never presented with, and never checked, any box indicating agreement to Defendant's Terms or Privacy Policy and never clicked any button or took any other affirmative action indicating consent to have her data captured by the Tracking Technology present on every page of the Website, or to have her communications intercepted by third parties when she used the Website.

154. The Tracking Technology described above was deployed on the Website, including on the product and checkout pages, and Plaintiff was unaware at the time that her information was being captured in real time by the Tracking Technology present on every page of the Website and disclosed to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar.

155. Had she known that Defendant was using the Tracking Technology on every page of the Website to capture the prescription lens she viewed and purchased and the identifying information she supplied, and that she would be profiled and targeted with advertisements on the basis of that information, Plaintiff would not have used the Website, would not have paid the price she paid for Defendant's products and services, or would have limited the information provided.

156. Following her use of the Website, Plaintiff began receiving targeted advertisements for contact lenses and related products on other websites, apps, and social-media platforms she used. The advertisements are the foreseeable product of the data flows alleged above: the Tracking Technology told Meta, Google, Microsoft, TikTok, Attentive, and Hotjar that Plaintiff—identified by the persistent identifiers those vendors maintain and, upon information and belief, by her hashed email address and telephone number—was a person who wears a particular prescription lens, and those vendors used that information to serve her targeted advertisements.

157. As a result of Defendant's conduct, Plaintiff's privacy rights were violated, and Plaintiff suffered harm in the form of loss of control over her private health-related and identifying information, increased anxiety due to unknown parties accessing sensitive data, loss of the benefit of the bargain in keeping or exchanging her private data, overpayment for products and services whose price included Defendant's promise of secure and confidential handling that Defendant did not keep, and other harms related to the undisclosed and non-consensual transmission of her PII and health-related information.

## VII. TOLLING, CONCEALMENT, AND ESTOPPEL

158. The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of the facts alleged herein.

159. The circumstances and nature of Defendant's data collection would lead reasonable users to believe that it was not collecting their information. The Tracking Technology operates invisibly, and the personal identifiers it captures are, in most instances, hashed inside the browser before transmission, such that its collection cannot be observed by a reasonable consumer.

160. Moreover, Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her own part.

161. Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiff. Defendant therefore is estopped from relying on any statute of limitations.

162. All applicable statutes of limitation also have been tolled by operation of the discovery rule. Specifically, Plaintiff and other Class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein, and Plaintiff did not learn of it until on or around October 18, 2026.

163. Accordingly, Plaintiff and the Class members could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

## CLASS ACTION ALLEGATIONS

164. Plaintiff, on behalf of herself and all others similarly situated, seeks relief under Federal Rule of Civil Procedure 23 on behalf of the following class and subclass (together the "Classes"):

> The Nationwide Class (the "Nationwide Class" or "Class"):
>
> All individuals in the United States who used the Website from when the Tracking Technology was implemented on the Website to the date of certification (the "Class Period").

> The Pennsylvania Subclass (the "Pennsylvania Subclass" or "Subclass"):
>
> All individuals who, while located in Pennsylvania, used the Website during the Class Period.

165. The following people are excluded from the Class and Subclass: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class or Subclass; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

166. Plaintiff reserves the right to revise or amend the Class definitions based on the discovery of new information.

167. Numerosity: The exact number of members of the Classes is unknown but, upon information and good faith belief, it is estimated to number in the tens of thousands, and individual joinder of these claims is therefore impracticable. Members of the Classes can be readily identified through Defendant's records and objective criteria, and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

168. Typicality: Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's wrongful conduct, misrepresentations, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages as a result of Defendant's uniform illegal conduct.

169. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

170. Commonality and Predominance: There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

a. Whether Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*;

b. Whether Defendant violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5701 *et seq.*;

c. Whether Defendant's use of the Tracking Technology is an unauthorized interception of electronic communications;

d. Whether Defendant intercepted Class members' communications for the purpose of committing criminal or tortious acts, such that the party exception of 18 U.S.C. § 2511(2)(d) does not apply;

e. Whether Website users were on inquiry notice of, or manifested assent to, Defendant's Privacy Policy or Terms;

f. Whether Defendant's representations and omissions concerning the confidentiality and security of users' information were deceptive within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

g. Whether Defendant's conduct constitutes an intrusion upon seclusion;

h. Whether Defendant was unjustly enriched by collecting and monetizing Class members' information;

i. Whether Plaintiff and Class members are entitled to damages and injunctive relief.

171. Superiority: There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Classes to receive monetary relief; the monetary relief suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and her counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

172. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include:

a. Whether Defendant obtained proper consent before recording users' interactions with the Website or recording users' information through the Website;

b. Whether Defendant's actions violated Website visitors' reasonable expectations of privacy; and

c. Whether Defendant's collection and disclosure of personal and health-related information through tracking technology constitutes an invasion of privacy.

173. Finally, all members of the proposed Classes are readily ascertainable as Defendant has access to Class members' names, emails, and physical addresses.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2510, *et seq.*
### *(On Behalf of Plaintiff & the Nationwide Class)*

174. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

175. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant.

176. The ECPA protects both the sending and receipt of communications.

177. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

178. A violation of the ECPA occurs where any person:

> "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication."

18 U.S.C. §§ 2511(1)(a), (c)–(d).

179. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

180. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio,

electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

181. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

182. Plaintiff's and Class members' requests for product pages identifying the prescription lenses they wear, the page titles and product identifiers returned in response, their cart selections, and the information they entered into Defendant's checkout forms are electronic communications, and the product names, product identifiers, page titles, and form contents transmitted to the third parties are the substance, purport, and meaning of those communications.

183. Whenever Plaintiff and Class members interacted with the Website and viewed, selected, and purchased prescription contact lenses, Defendant, through the Meta Pixel and Conversions API Gateway, the Google Ads tag, the Microsoft UET tag, the TikTok Pixel, the Attentive tag, and the other Tracking Technology it embedded in the Website, contemporaneously and intentionally intercepted the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, and redirected such contents to third parties other than an addressee or intended recipient of such communications.

184. Whenever Plaintiff and Class members interacted with the Website, Defendant, through at least the Meta, Google, Microsoft, TikTok, Attentive, and Hotjar tracking technologies embedded on the Website, contemporaneously and intentionally divulged the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, to each third party other than an addressee or intended recipient of such communication.

185. Defendant intentionally intercepted and used the contents of Plaintiff's and Class members' electronic communications for unauthorized purposes including disclosing and, on information and belief, profiting from, Plaintiff's and Class members' communications by transmitting the contents to third parties for marketing analytics and behavioral targeting purposes.

186. Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of sharing the sensitive information contained therein with third parties.

187. The ECPA's exception for interceptions by a party to the communication does not apply. Under 18 U.S.C. § 2511(2)(d), it is unlawful for a party to intercept a communication, or for a person to intercept with one party's consent, where "such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

188. Defendant intercepted Plaintiff's and Class members' electronic communications for the purpose of committing criminal acts in violation of the laws of Pennsylvania: the intentional disclosure to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar of the contents of electronic communications intercepted without the prior consent of all parties, and the intentional use of those contents for advertising measurement, audience building, retargeting, and marketing, each of which is a felony of the third degree under 18 Pa.C.S. § 5703(2) and (3).

189. Defendant also intercepted Plaintiff's and Class members' electronic communications for the purpose of committing tortious acts in violation of the laws of Pennsylvania: the intrusion upon Plaintiff's and Class members' seclusion through the surreptitious acquisition and disclosure of their prescription products and identities, and deceptive

conduct creating a likelihood of confusion or misunderstanding in violation of the UTPCPL, 73 P.S. § 201-2(4)(xxi).

190. That criminal and tortious purpose was independent of the interception itself. Defendant installed the Tracking Technology to disclose the intercepted communications to advertising and marketing platforms so that those platforms would profile Plaintiff and Class members, target them with advertisements, and enroll them in marketing programs, and so that Defendant would profit from doing so. Defendant intended that disclosure and use when it placed each vendor's code on the Website and configured the events and identifiers to be transmitted.

191. Defendant intercepted Plaintiff's and Class members' electronic communications for purposes other than fulfilling Plaintiff's and Class members' orders, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

192. As a direct and proximate result of Defendant's violation of the ECPA, Plaintiff and Class members were damaged by Defendant's conduct in that:

a. Defendant harmed Plaintiff's and Class members' interest in privacy;

b. Sensitive and confidential information that Plaintiff and Class members intended to remain private between them and Defendant was disclosed to third parties;

c. Defendant eroded the essential confidential nature of its relationship to Website users;

d. Defendant took something of value from Plaintiff and Class members and derived benefit therefrom without Plaintiff's and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiff and Class members did not get the full value of the products and services for which they paid, which included Defendant's duty to maintain confidentiality; and

f. Defendant's actions diminished the value of Plaintiff's and Class members' personal and health-related information.

193. Plaintiff, individually and on behalf of the Class members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages under 18 U.S.C. § 2520(c)(2), punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT
### 18 Pa.C.S. § 5701, *et seq.*
### *(On Behalf of Plaintiff & the Pennsylvania Subclass)*

194. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

195. Plaintiff brings this claim individually and on behalf of the members of the Pennsylvania Subclass against Defendant.

196. The Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa.C.S. § 5701, *et seq.*, protects the privacy of wire, oral, and electronic communications in Pennsylvania.

197. WESCA provides that a person is guilty of a felony of the third degree if he "(1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication; (2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or (3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the

information was obtained through the interception of a wire, electronic or oral communication." 18 Pa.C.S. § 5703.

198. WESCA defines "intercept" as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device"; "contents" as "any information concerning the substance, purport, or meaning of that communication"; and "electronic communication" as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa.C.S. § 5702.

199. WESCA contains no exception for interceptions by a party to the communication, and the Third Circuit has so held: "there is no sweeping direct-party exception to civil liability under the WESCA." *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 126 (3d Cir. 2022). Instead, it is lawful for a person to intercept an electronic communication only "where all parties to the communication have given prior consent to such interception." 18 Pa.C.S. § 5704(4). Pennsylvania is thus an "all-party consent" state.

200. The Third Circuit has further held that an interception under WESCA "occurs where there is an act taken to gain possession of communications using a device"—that is, at the point where a website visitor's communications are routed by code running in her browser to a third party's servers—and not at the location of the third party's servers. *Popa*, 52 F.4th at 131.

201. 18 Pa.C.S. § 5725(a) provides that "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication."

202. At all relevant times, Plaintiff and the members of the Pennsylvania Subclass were physically located in Pennsylvania when accessing and using the Website, and the interceptions alleged herein occurred in Pennsylvania, at the point where code executing in Plaintiff's and Subclass members' browsers routed their communications to the third parties' servers.

203. Plaintiff's and Pennsylvania Subclass members' communications with Defendant through the Website constitute "electronic communications" within the meaning of 18 Pa.C.S. § 5702. Each is a statement the user made to Defendant, and each of items (a) through (d) below was acquired by the Tracking Technology in the very terms the user communicated:

a. The prescription lens the user wears, conveyed by the user's request for the product page for that lens and by the page title returned in response;

b. The product's category and price;

c. The URL of the product page;

d. The user's commencement and submission of Defendant's checkout forms; and

e. The identity of the person making those statements.

204. Each of items (a) through (d) is the substance, purport, and meaning of what the user said to Defendant—the "contents" of the user's communication under 18 Pa.C.S. § 5702—and not merely a record of the user's movement through the Website; item (e) ties those contents to the person who communicated them. Nor is any of them a "communication from a tracking device" excluded from the definition of "electronic communication" by § 5702: the communications at issue are the user's statements to Defendant, which originate from the user, not from any device.

205. Through the Tracking Technology embedded on the Website, Defendant procured third parties to intercept Plaintiff's and Pennsylvania Subclass members' electronic

communications contemporaneously with their transmission, by causing a duplicate of the contents of those communications to be transmitted to the third parties' servers at the same moment the communications were transmitted to Defendant.

206. The Tracking Technology constitutes an "electronic, mechanical or other device" within the meaning of 18 Pa.C.S. § 5702. It is code that Defendant caused to execute in the user's browser, which acquires the contents of the user's communications to Defendant and transmits a copy of those contents to third-party servers at the moment of transmission. It falls within no exclusion in § 5702.

207. Meta, Google, Microsoft, TikTok, Attentive, and Hotjar are not parties to the user's communications with Defendant. Defendant procured each of them to intercept those communications by installing their code on the Website, configuring it to execute on the product, cart, and checkout pages, and enabling the event-tracking, dynamic-remarketing, advanced-matching, and server-side-tagging features through which that code acquires the contents of the user's statements. 18 Pa.C.S. § 5703(1) makes it unlawful to "procure[] any other person to intercept or endeavor to intercept" a communication, and § 5725(a) provides a civil action against one who "procures any other person to intercept, disclose or use" it.

208. Defendant further intentionally disclosed the contents of Plaintiff's and Pennsylvania Subclass members' intercepted communications to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar and intentionally used those contents for advertising measurement, audience building, retargeting, analytics, and SMS and email marketing, knowing or having reason to know that the contents were obtained through the interception of electronic communications in violation of 18 Pa.C.S. § 5703.

209. Defendant's interception of Plaintiff's and Pennsylvania Subclass members' electronic communications was accomplished without the prior consent of all parties to the communication. Specifically:

a. Interception begins immediately upon accessing the Website and continues with every product page viewed and every checkout step completed, before any opportunity for users to provide informed consent;

b. Defendant never obtained express consent from Plaintiff or Pennsylvania Subclass members before intercepting their communications;

c. The Website solicits—and intercepts—users' product-page requests, cart selections, and checkout information before users create an account or review the Privacy Policy;

d. Defendant never provided clear, conspicuous notice that users' electronic communications revealing their prescription products and identities would be intercepted and shared with third parties;

e. The only references to Defendant's Privacy Policy and Terms are footer hyperlinks placed below the fold on the shopping pages and absent altogether from the checkout and account sign-up pages, which users are never required to pass, and no user is asked to check a box, click through, or otherwise manifest assent to either document;

f. Neither the Privacy Policy nor the Terms discloses the Tracking Technology, the third parties that receive data through it, or the data they receive; the Privacy Policy instead represents that Defendant will not disclose users' personally identifiable information to any outside party and will not sell their health information; and

g. Any purported consent was ineffective because the interception began before consent could be obtained, because no document describing Defendant's data-sharing practices was ever presented to users for review or acceptance, because no such document exists, and because a disclosure buried in a footer-linked document that users are never shown—let alone a document that denies the practice—is not the "prior consent" of "all parties" that 18 Pa.C.S. § 5704(4) requires, and no user "knew or should have known" that her communications were being acquired by Meta, Google, Microsoft, TikTok, Attentive, or Hotjar.

210. The intercepted communications include sensitive health-related and identifying information that Plaintiff and Pennsylvania Subclass members provided with reasonable expectations of privacy and confidentiality, including:

a. The specific prescription contact lens—by brand, manufacturer, modality, and product identifier—that the user viewed, selected, and purchased;

b. The fact that the user wears corrective contact lenses and, where the product is a toric or multifocal lens, that the user has astigmatism or presbyopia;

c. The user's commencement and submission of checkout forms soliciting the user's name, address, email address, telephone number, prescription parameters, prescriber, insurance, and payment information; and

d. The persistent identifiers, and, upon information and belief, the hashed email addresses and telephone numbers, by which each third party links those disclosures and purchases to a specific individual.

211. Defendant's conduct was willful and intentional, as Defendant deliberately implemented the Tracking Technology knowing it would intercept users' electronic communications without the consent of all parties.

212. As a direct and proximate result of Defendant's violations of WESCA, Plaintiff and Pennsylvania Subclass members have suffered concrete injury in fact. The Tracking Technology disclosed to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar private facts about their health—the prescription medical device they wear and the vision condition it treats—linked to identifiers for the person who disclosed them. The unauthorized disclosure of private health-related facts to third parties is an injury that bears a close relationship to the harms redressed by the common-law tort of intrusion upon seclusion, and it has long been recognized as a basis for suit in American courts. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). That injury was complete upon the disclosure, does not depend on any downstream use of the information, and exists independently of the statutory violation.

213. Plaintiff continues to wear prescription contact lenses, continues to desire to purchase them online, and has a reasonable fear that her electronic communications will continue to be intercepted without consent if she uses the Website.

214. Each communication intercepted in violation of WESCA is a separate violation. In the alternative, each day on which Plaintiff's or a Pennsylvania Subclass member's communications were intercepted is a separate day of violation. For each violation, Plaintiff and Pennsylvania Subclass members are entitled under 18 Pa.C.S. § 5725(a) to:

a. Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher, 18 Pa.C.S. § 5725(a)(1);

b. Punitive damages, 18 Pa.C.S. § 5725(a)(2); and

c. A reasonable attorney's fee and other litigation costs reasonably incurred, 18 Pa.C.S. § 5725(a)(3).

215. Unless enjoined by this Court, Defendant will continue to intercept the electronic communications of Pennsylvania Subclass members and other Website visitors without their consent, causing irreparable harm for which there is no adequate remedy at law.

## THIRD CAUSE OF ACTION

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 P.S. § 201-1, *et seq.*
***(On Behalf of Plaintiff & the Pennsylvania Subclass)***

216. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

217. Plaintiff brings this claim individually and on behalf of the members of the Pennsylvania Subclass against Defendant.

218. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3. Among the "unfair or deceptive acts or practices" the statute defines is "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

219. The UTPCPL is a remedial statute that is to be liberally construed to effectuate its purpose of protecting consumers from unfair or deceptive business practices. Liability under the catch-all provision does not depend upon the actor's state of mind; conduct that has the capacity to deceive and that creates a likelihood of confusion or misunderstanding is actionable without proof of intent or negligence. *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637 (Pa. 2021).

220. Plaintiff and the Pennsylvania Subclass members purchased goods and services—prescription contact lenses, shipping, and, for some, Defendant's "Use My Insurance" claim-submission service—primarily for personal, family, or household purposes, and Defendant's marketing and sale of those goods and services through the Website constitute "trade" and "commerce" within the meaning of 73 P.S. § 201-2(3).

221. Defendant engaged in deceptive conduct creating a likelihood of confusion or misunderstanding in violation of 73 P.S. § 201-2(4)(xxi) by representing, expressly and by implication, that users' information would be handled securely and confidentially—including by labeling its checkout "Secure Checkout" and "SSL Secure," by holding itself out as an "Authorized Distributor" that verifies each customer's prescription with the customer's eye doctor, by soliciting customers' vision-insurance information in order to submit benefits claims on their behalf, while simultaneously transmitting users' prescription-product selections, checkout activity, and

identifiers to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar for advertising and marketing purposes.

222. Defendant further engaged in deceptive conduct by omitting to disclose, at or before the point of collection, that it would transmit that information to those third parties. Defendant had a duty to disclose that practice because (a) Defendant's affirmative representations of secure and confidential handling, and its Privacy Policy's affirmative promises not to disclose personally identifiable information or health information for compensated marketing, were half-truths that Defendant was obligated to complete; (b) Defendant, as a seller of prescription medical devices that solicits and verifies prescription and insurance information, possessed superior and exclusive knowledge of its own undisclosed data flows, which no consumer could discover through reasonable diligence; and (c) the FTC has repeatedly determined, in its GoodRx and BetterHelp actions and its July 2023 joint guidance, that the undisclosed transmission of consumers' health-related information to advertising platforms through tracking technologies is deceptive and unfair under Section 5 of the FTC Act.

223. These representations and omissions had the capacity to deceive, created a likelihood of confusion or misunderstanding, and did mislead consumers acting reasonably in the circumstances. A reasonable consumer deciding whether to supply her prescription, insurance, and identifying information to an online contact-lens retailer, and whether to pay that retailer's price, would consider it important that the retailer would transmit her prescription product and identity to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar.

224. Plaintiff and the Pennsylvania Subclass members justifiably relied on Defendant's representations and on the absence of any disclosure of the Tracking Technology in deciding to use the Website, to supply their information, and to purchase Defendant's goods and services at

the prices charged. Had Defendant disclosed its practices, Plaintiff and the Pennsylvania Subclass members would not have used the Website, would not have paid the prices they paid, or would have limited the information they provided.

225. As a direct and proximate result of Defendant's deceptive conduct, Plaintiff and the Pennsylvania Subclass members suffered ascertainable losses of money or property. Plaintiff and the Pennsylvania Subclass members paid for prescription products and services whose price included, and whose value depended upon, the secure and confidential handling of their prescription and identifying information; the products and services they received—accompanied by the transmission of their information to advertising and marketing platforms—were worth less than those they paid for, and Plaintiff and the Pennsylvania Subclass members would not have paid the price they paid, or would not have purchased at all, had Defendant's practices been disclosed. Plaintiff and the Pennsylvania Subclass members also suffered the diminution in value of their personal and health-related information, which has independent economic value that Defendant appropriated.

226. Pursuant to 73 P.S. § 201-9.2(a), Plaintiff and the Pennsylvania Subclass members are entitled to recover their actual damages or $100 for each violation, whichever is greater; treble damages in the Court's discretion; and costs and reasonable attorneys' fees, together with such additional relief as the Court deems necessary or proper, including an injunction prohibiting Defendant from continuing the practices alleged herein.

## FOURTH CAUSE OF ACTION

### INTRUSION UPON SECLUSION
***(On Behalf of Plaintiff & the Pennsylvania Subclass)***

227. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

228. Plaintiff brings this claim individually and on behalf of the members of the Pennsylvania Subclass against Defendant.

229. Pennsylvania recognizes the common-law tort of intrusion upon seclusion as set forth in Section 652B of the Restatement (Second) of Torts: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Burger v. Blair Med. Assocs., Inc.*, 964 A.2d 374 (Pa. 2009).

230. Plaintiff and Pennsylvania Subclass members had a reasonable expectation of privacy in their communications with the Website concerning the prescription medical device they wear, the vision condition it treats, their prescription and prescriber, their vision-insurance coverage, and the identifying information they supplied in order to have a prescription product shipped to their homes—information that is among the private affairs and concerns that an individual is ordinarily entitled to keep to herself, and that is protected by a web of federal and state privacy laws.

231. Defendant intentionally intruded upon that seclusion by deploying the Tracking Technology to electronically capture Plaintiff's and Pennsylvania Subclass members' communications as they were made, and by transmitting them to Meta, Google, Microsoft, TikTok, Attentive, and Hotjar, without Plaintiff's or Pennsylvania Subclass members' knowledge or consent. The intrusion served no purpose of Plaintiff's or the Subclass members', and Defendant accomplished it without disclosure, contrary to its own representations of secure and confidential handling and its own Privacy Policy's promises not to disclose.

232. Defendant's intrusion would be highly offensive to a reasonable person. A reasonable person purchasing prescription contact lenses through a "Secure Checkout" from a

retailer that verifies her prescription with her eye doctor and offers to submit a claim to her vision-insurance plan would find it highly offensive that the retailer was simultaneously reporting the lens she wears, the condition it corrects, and her identity to six social-media, search, analytics, and marketing companies so that she could be profiled, targeted with advertisements, and solicited by text message.

233. As a direct and proximate result of Defendant's intrusion, Plaintiff and Pennsylvania Subclass members suffered injury, including the loss of privacy in their health-related and identifying information, mental anguish and distress, and the loss of the value of their personal and health-related information, and are entitled to compensatory damages, punitive damages for Defendant's willful and wanton conduct, and injunctive relief.

## FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT
***(On Behalf of Plaintiff & the Nationwide Class)***

234. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

235. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant, in the alternative to her claims at law.

236. Under Pennsylvania law, a claim for unjust enrichment lies where (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under circumstances in which it would be inequitable for the defendant to retain the benefit without payment of value. *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999).

237. Plaintiff and Class members conferred a benefit upon Defendant by paying for Defendant's prescription contact lenses, shipping, and related services, and by providing valuable

personal and health-related information—including the prescription products they viewed and purchased, their prescription and prescriber details, and their personal identifiers—through their use of the Website. Defendant had knowledge of and voluntarily accepted and retained those benefits.

238. Individual health records command premium prices in data markets, valued as much as fifty times more than credit card information due to their comprehensive nature and permanence.[48] Purchase data for prescription products that consumers reorder on a recurring schedule is especially valuable to advertisers.

239. Defendant received and retained this benefit by intercepting, collecting, and transmitting Plaintiff's and Class members' information to third parties through embedded technology without authorization or consent.

240. Defendant has been unjustly enriched through several mechanisms:

a. Data Monetization: Defendant derives commercial value from sharing users' prescription-product and identifying information with third parties for marketing analytics, behavioral targeting, and user profiling purposes, including lower customer-acquisition costs, more effective retargeting of prospective and lapsed customers, and higher reorder rates driven by Attentive's SMS and email programs;

b. Cost Avoidance: Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable data;

c. Competitive Advantage: Defendant gained competitive advantages by leveraging detailed customer profiles to optimize its platform and marketing without bearing the costs associated with compliant data collection.

[48] *See Why Medical Data is 50 Times More Valuable Than a Credit Card, supra* n. 15.

241. Defendant obtained this benefit through unlawful interception and unauthorized disclosure of Plaintiff's and Class members' information in violation of the ECPA, WESCA, and the UTPCPL.

242. Plaintiff and Class members provided this information and paid Defendant's price with a reasonable expectation of privacy, while Defendant did not disclose its data collection and sharing practices to users, who were unaware their information was being intercepted and monetized.

243. Defendant's retention of these benefits is inequitable because Defendant profited from the unauthorized use of sensitive personal information without compensating the individuals whose privacy was violated.

244. Plaintiff and Class members have no adequate remedy at law for Defendant's unjust enrichment, as they cannot recover the specific value of their appropriated data through traditional damages calculations.

245. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and Class members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their information.

246. Plaintiff and Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Natalie Krall, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant WebEyeCare, Inc. and in favor of Plaintiff and the Classes, and grant the following relief:

A. Certify this case as a class action on behalf of the Classes defined above, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

B. Enter a judgment finding that Defendant's actions, as described herein, violate the Electronic Communications Privacy Act (18 U.S.C. § 2510 *et seq.*), the Pennsylvania Wiretapping and Electronic Surveillance Control Act (18 Pa.C.S. § 5701 *et seq.*), and the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. § 201-1 *et seq.*), and constitute an intrusion upon seclusion;

C. Award injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Classes including: (i) an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein; (ii) an order requiring Defendant to implement proper notice and consent mechanisms before using tracking technology; and (iii) an order requiring Defendant to destroy, and to direct its vendors to destroy, all data collected through unlawful monitoring practices;

D. Award to Plaintiff and the Nationwide Class damages as authorized by the Electronic Communications Privacy Act, 18 U.S.C. § 2520(c)(2): the greater of actual damages plus any profits attributable to the violation, or statutory damages of the greater of $100 per day for each day of violation or $10,000, subject to the Court's statutory discretion;

E. Award liquidated damages to Plaintiff and the Pennsylvania Subclass under the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5725(a)(1), in the amount of the greater of $100 per day for each day of violation or $1,000, or actual damages, whichever is higher, together with punitive damages under 18 Pa.C.S. § 5725(a)(2);

F. Award actual damages or statutory damages of $100 per violation, whichever is greater, and treble damages, to Plaintiff and the Pennsylvania Subclass under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-9.2(a);

G. Award compensatory and punitive damages to Plaintiff and the Pennsylvania Subclass for Defendant's intrusion upon seclusion;

H. Award restitution and disgorgement of Defendant's unjust enrichment, including all revenue derived from its unlawful business practices;

I. Award Plaintiff and the Classes reasonable litigation expenses and attorneys' fees, including under 18 U.S.C. § 2520(b)(3), 18 Pa.C.S. § 5725(a)(3), and 73 P.S. § 201-9.2(a);

J. Award Plaintiff and the Classes pre- and post-judgment interest to the extent allowable; and

K. Award such other and further relief as equity and justice may require.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury for all issues so triable.

Dated: October 29, 2026

Respectfully submitted,

By: *<u>/s/ Nicholas A. Colella</u>*
Gary F. Lynch (Bar No. 56887)
Nicholas A. Colella (Bar No. 332699)
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Email: gary@lcllp.com
Email: nickc@lcllp.com

David S. Almeida (*pro hac vice* forthcoming)
Lucas Coughlin (*pro hac vice* forthcoming)
Victor J. Sandoval (*pro hac vice* forthcoming)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
T: (708) 437-6476
Email: david@almeidalawgroup.com
Email: victor@almeidalawgroup.com
Email: luke@almeidalawgroup.com

*Attorneys for Plaintiff and the Proposed Class*